517 F.2d 666
 In re GRAND JURY PROCEEDINGS.
UNITED STATES of America, Appellee,
v.
Knox JONES, Roberto J. Yzaguirre, Arturo Guerra, Jr., Jose
Antonio Canales, G.Rudolph Garza and Ramon Garcia,
Appellants.
 No. 75-1990.
 United States Court of Appeals,
Fifth Circuit.
 July 30, 1975.
 
 Frank Maloney, Austin, Tex., for appellants.
 Theodore I. Koskoff, James Diorio, Bridgeport, Conn., John A. Burgess, Montpelier, Vt., amicus curiae, for Assoc. of Trial Lawyers of America.
 Marvin O. Teague, David Bires, Houston, Tex., amicus curiae, for Texas Criminal Defense Lawyers Assn.
 Edward B. McDonough, Jr., U. S. Atty., Ronald Tonkin, James R. Gough, Asst. U. S. Attys., Houston, Tex., for appellee.
 Appeal from the United States District Court for the Southern District of Texas.
 Before THORNBERRY, SIMPSON and RONEY, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 With this opinion we discharge the obligation that we undertook in our earlier per curiam Order. There we reversed the judgment of the district court whereby the relators-appellants had been sentenced to jail for civil contempt. The district judge found relators in contempt after they disobeyed his directive to answer certain questions propounded by the Assistant United States Attorney before the grand jury.[1] The relators were released on recognizance bonds pending appeal.
 
 
 2
 Our decision to reverse rests on what we conclude is the proper resolution of a discrete issue concerning the privilege of a client to require an attorney to maintain silence about the client's confidential disclosures, commonly known as the "attorney-client" privilege in the law of evidence. Our circuit has not spoken heretofore on the problem presented by this case, although situations bearing some resemblance have arisen elsewhere. In all candor, we need not and do not purport to reach a result which may be reconciled in all respects with every decision by every other court. Nevertheless, we emphasize our satisfaction that the facts and circumstances revealed by this record amply justify the availability of the privilege. Other cases must turn on their own merits.
 
 
 3
 In April of 1975 the federal grand jury for the Southern District of Texas, Laredo Division, was investigating possible narcotics and income tax violations on the part of certain suspected individuals who reside in south Texas in McAllen among other places. This investigation was conducted under the guidance of the United States Attorney's office, and it appears that one or more prosecutors were engaged in related investigations ancillary to the grand jury proceedings.
 
 
 4
 Each of the relators is a duly-licensed Texas attorney of unchallenged standing before state and federal bars. Around the first of April, each was served with a subpoena commanding him to appear and testify at the grand jury's meeting scheduled for April 7. In addition, the subpoenas directed relators to bring with them "all records, retainer agreements, books, records, and/or receipts showing payment of attorneys' fees" for the accounts of specific, named clients who had either recently been convicted or were then under arrest or indictment for large-quantity marijuana offenses.
 
 
 5
 The relators responded to the subpoenas but filed motions to quash. They asserted that compulsion of their testimony as to certain questions would disclose communications made to them in confidence by unidentified individuals whom relators claimed to represent in a professional capacity. The prosecutor disclaimed any desire to force disclosure of such communications insofar as they constituted discussions of matters which might have led to legal advice, but he maintained that the identities of unknown clients and information about their legal fee and bonding arrangements in behalf of known clients was not privileged. The government admittedly intended to use those disclosures, if obtained, in furtherance of the grand jury's and its own investigations in whatever manner proved fruitful. A hearing was held on April 7 and 8, and the district court ordered relators to testify.
 
 
 6
 Thereafter each relator appeared before the grand jury; each answered some questions for example, the amount of a given fee or who physically posted bond money for a named, known client; but each refused to answer questions regarding the identities of third parties who might have furnished bond money or paid (or promised to pay) attorneys' fees for the known clients. Each relator based his refusal on the claimed privilege of an unidentified client.
 
 
 7
 Subsequently, in another session before the district court, the prosecutor and counsel for relators reached agreement about the nature of the information which was claimed to be privileged. The court ordered relators to return to the grand jury room and answer these four questions:
 
 
 8
 (1) Did the named defendant employ you to represent him?
 
 
 9
 (2) Did any third party make arrangements for the attorney to represent the named defendant?
 
 
 10
 (3) If bond was posted for the named defendant, who furnished the bond money to the attorney-witness for deposit with the United States Magistrate?
 
 
 11
 (4) If attorneys' fees had been paid, who paid the attorneys' fees for the named defendant? And, if attorneys' fees had not been paid, who promised to pay the balance of the moneys owed to the attorney-witness for the named defendant?
 
 
 12
 The ensuing rounds of questioning and refusals to testify before the grand jury left essentially numbers (2), (3), and (4) unanswered. Once again the relators claimed the attorney-client privilege of an undisclosed client. The government moved the court to declare relators in contempt. Another hearing took place, at which time relators testified that they had been sought out by persons seeking legal services around the times when they were employed by the clients named in the subpoenas. It was further established or stipulated that those undisclosed persons made communications to relators in an atmosphere of confidentiality. Counsel for relators asked the court to propound additional questions to relators in chambers, with only the court reporter present. Counsel proposed to allow the court to take further testimony from the relators in order to develop in greater detail the asserted attorney-client relationships between relators and the undisclosed individuals. The district judge denied this request, and warned against further pursuit of the matter in open court on pain of full cross-examination by the government. The court also refused to allow relators' counsel to question the prosecutor about the nature of the government and grand jury investigations. The relators were found in contempt, and the district court issued its unpublished memorandum opinion shortly thereafter.
 
 
 13
 This appeal presents the narrow but always elusive problem of determining whether an attorney-client privilege attaches to such matters as the fact of retention, the identity of the client, and information surrounding fee and bonding arrangements executed by or on behalf of a client. At the outset, we agree with the parties that the question is governed in this circuit by a federal common law of criminal evidence. United States v. Woodall, 5 Cir. 1970, 438 F.2d 1317, 1327 (en banc), cert. denied, 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971). Under F.R.Crim.P. 26, the principles of the common law, "as they may be interpreted by the courts of the United States in the light of reason and experience," govern over state law in matters of evidence, which includes privileges. See Federal Rule of Evidence 501, effective July 1, 1975. This circuit, however, has never passed on the issues sub judice, and for that reason we may look first to the decisions of other federal courts and then to state court decisions for whatever guidance they provide.
 
 
 14
 The basic elements which are necessary in order to establish a claim of the client's privilege are the following:
 
 
 15
 (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is (the) member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.
 
 
 16
 United States v. United Shoe Machinery Corp., D.Mass.1950, 89 F.Supp. 357, 358-59. We utilize this description solely because of Judge Wyzanski's comprehensiveness, and not because it is any more accurate than a number of other widely-accepted general formulations. E. g., 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961); C. McCormick, Evidence §§ 87-88 (Cleary ed. 1972).
 
 
 17
 The true difficulty comes not in listing the necessary ingredients, but in applying the usual tests to unique fact situations. Along with many other courts,[2] we have stated that "(t)he identity of a client is a matter not normally within the privilege, Frank v. Tomlinson, 351 F.2d 384 (5th Cir. 1965), cert. denied, 382 U.S. 1028, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966), nor are matters involving the receipt of fees from a client usually privileged, see United States v. Finley, 434 F.2d 596 (5th Cir. 1970)." United States v. Ponder, 5 Cir. 1973, 475 F.2d 37, 39 (emphasis added). The court below followed this "general rule" in rejecting the relators' claims and in finding them in contempt.
 
 
 18
 Despite the general rule, we have clearly recognized, albeit in dicta, that an exception exists. "Under certain circumstances, an attorney must conceal even the identity of a client, not merely his communications, from inquiry." American Can Co. v. Citrus Feed Co., 5 Cir. 1971, 436 F.2d 1125, 1128, citing Baird v. Koerner, 9 Cir. 1960, 279 F.2d 623, 635. The well-known Baird case, which involved an IRS summons seeking disclosure of the identity of the client on whose behalf the witness-lawyer had made an anonymous tax payment, was followed in Tillotson v. Boughner, 7 Cir. 1965, 350 F.2d 663, and NLRB v. Harvey, 4 Cir. 1965, 349 F.2d 900. Our cases have split with Baird only to the extent that the Ninth Circuit has followed state law in deciding issues of evidentiary privilege. E. g., In re Michaelson, 9 Cir. 1975, 511 F.2d 882, cert. denied, --- U.S. ---, 95 S.Ct. 1979, 44 L.Ed.2d 469 (1975). The exception announced in Baird, where applicable, is as much a part of this circuit's federal law of evidence as is the normal rule of no privilege. We so hold.[3]
 
 
 19
 The cases applying the exception have carved out only a limited and rarely available sanctuary, which by virtue of its very nature must be considered on a case-to-case basis. It could hardly be otherwise, since the purpose of privilege to suppress truth runs counter to the dominant aims of the law. The exception, however, though sometimes difficult to grasp and apply, is not quite so confined as the government would make it. The government and the court below have taken the position that a client's identity, fee, and bonding arrangements can never be privileged unless disclosure would lead automatically to conviction for a criminal offense.
 
 
 20
 That is not the law. We quote from the portion of the Baird decision which states the essence of the analysis, and demonstrates that the correct approach is a matter of logical relevance and probative value not quantum sufficiency:
 
 
 21
 The facts of the instant case bring it squarely within the exception to the general rule. Here money was received by the government, paid by persons who thereby admitted they had not paid a sufficient amount in income taxes some one or more years in the past. The names of the clients are useful to the government for but one purpose to ascertain which taxpayers think they were delinquent, so that it may check the records for that one year or several years. The volunteer nature of the payment indicates a belief by the taxpayers that more taxes or interest or penalties are due than the sum previously paid, if any. It indicates a feeling of guilt for nonpayment of taxes, though whether it is criminal guilt is undisclosed. But it may well be the link that could form the chain of testimony necessary to convict an individual of a federal crime. (citing in footnote the classic Fifth Amendment case, Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)). Certainly the payment and the feeling of guilt are the reasons the attorney here involved was employed to advise his clients what, under the circumstances, should be done.
 
 
 22
 279 F.2d at 633 (emphasis added). In Baird the Ninth Circuit took counsel in Wigmore's admonitions that "much ought to depend on the circumstances of each case," and that the privilege should be held to protect the client from disclosure by the attorney of the client's "ultimate motive" for seeking legal advice. Id. at 630. In Harvey the Fourth Circuit refined the exception another degree: "The privilege may be recognized when so much of the actual communication has already been disclosed (not necessarily by the attorney, but by independent sources as well) that identification of the client amounts to disclosure of a confidential communication." 349 F.2d at 905. There the first link in the chain of evidence had been supplied by a private detective who, on pain of contempt, admitted that he had been hired by attorney Harvey to spy on a union organizer. This revelation indicated the obvious that a third party had hired Harvey. It was the third party's identity which the Labor Board sought to compel Harvey to disclose, but which the court thought was in all likelihood privileged because "upon identification of the client, it will be known that the client wanted information about (the organizer). More than the identity of the client will be disclosed by naming the client." Id. Yet it was far from certain that the client, if identified, would be found guilty of an unfair labor practice to use the words of the district judge in this case "as night follows day."
 
 
 23
 We turn now to an examination of the issue of privilege in the context of the particular circumstances presented by the record in this appeal. Preliminarily, we have no complicating problem of self-incrimination. The relators are not, at least as principals, the immediate subjects of investigation. Correspondingly, their sole reliance is upon the attorney-client privilege not the Fifth Amendment, either for themselves or vicariously for their undisclosed clients. Similarly, no grants of immunity are involved here.
 
 
 24
 We have, instead, a situation in which it is readily apparent that the relators were called to testify before the grand jury for the purpose of incriminating their undisclosed clients as to privileged communications, perhaps to the point at which indictments could be returned against those clients. Consideration of the record demonstrates not only a proper case for the privilege, but also a less-than-candid submission by the government to this court. At oral argument, counsel for the government aware of the Baird exception's focus on the relevancy of what remains undisclosed vis-a-vis the probative value of what has already been disclosed represented to us:
 
 
 25
 There is nothing in the record which would warrant the exception in this case.
 
 
 26
 We have no indication whatsoever and I state this as an officer of the court of any criminality on the part of anybody.
 
 
 27
 The record contains an entirely different set of representations and paints an entirely different picture. Grand jury proceedings are secret, and therefore we shall not mention any names, but before the grand jury the government questioned each relator about his relationship with four specific individuals, none of whom was named in the subpoenas. The relators claimed the privilege in response to these questions. Earlier, during the hearing on the motions to quash the subpoenas, government counsel (the same attorney who made the above-quoted representations to us) explained to the district judge why the subpoenas had been issued, and why the government sought the relators' testimony:
 
 
 28
 Your honor, there is another point, and that is possible income tax violations, not of these particular individuals (the named clients), but others who have paid the fees, whether they are making such money to report the income as well as the payment of fees to these attorneys.
 
 The court:
 
 29
 I am lost. Now, run that by me again.
 
 Government counsel:
 
 30
 We have information that certain individuals in the community have paid fees to these attorneys, and they have reported that they have made so much money during the year. In fact, they report making twenty-thousand dollars a year, but they paid thirty thousand dollars of unreported income to attorneys. That would in fact show they made more money than they reported. Does your honor understand what I am saying?
 
 
 31
 (emphasis added).
 
 The court:
 
 32
 No, I am lost. You are not seriously having any internal revenue investigation, are you?
 
 Government counsel:
 
 33
 Yes, your honor. The problem is this: Mr. A. says he made twenty-thousand dollars, but in fact he paid these attorneys thirty thousand in a particular year of unreported income and unreported expenses. It is conceivable that there may be income tax violations.
 
 
 34
 The district judge diverted the line of discussion at this point. He assumed that the payor might have "a million dollar trust fund in the bank," and therefore income tax violations "wouldn't necessarily follow." The court was far more interested in the ethical problem presented by the attorneys' potential conflicts of interest, which in the district judge's view gave rise to law enforcement difficulty in securing plea bargains with named "mule" clients in return for their cooperation with the government in its efforts to prosecute undisclosed "patron" clients.
 
 
 35
 Government counsel's statements to the district court, and later to this court, are plainly inconsistent. Assuming arguendo that the Department of Justice may legitimately use the grand jury for the comparatively benign purpose of policing the ethics of the criminal bar, and that the general rule of no privilege would then apply, this record reflects a clearly prosecutorial, rather than disciplinary, objective. In this country the privilege has belonged traditionally to the client, not the lawyer. It is a creature of public policy calculated to encourage people to seek legal advice on the basis of frank, useful communications. The purpose of the privilege would be undermined if people were required to confide in lawyers at the peril of compulsory disclosure every time the government decided to subpoena attorneys it believed represented particular suspected individuals. Just as the client's verbal communications are protected, it follows that other information, not normally privileged, should also be protected when so much of the substance of the communications is already in the government's possession that additional disclosures would yield substantially probative links in an existing chain of inculpatory events or transactions. The client may reasonably expect the lawyer to maintain silence in such circumstances, for disclosure could drastically diminish the value of legal discussions or planning that took place previously, or at least alter the course of subsequent strategy.[4] The government misses the point when it argues that a possible (here totally unproven) dereliction of professional responsibility by a lawyer must preclude the existence of a "bona fide" attorney-client relationship for purposes of the law of evidence. A variety of other forums possess superior ability to deal with the ethical problems of which the government complains. Nor are federal district courts powerless to impose appropriate sanctions when multiple representation reaches unethical dimensions. See generally, ABA Code of Professional Responsibility, Canon 5, EC 5-14 to 23, DR 5-105, 5-107 & n. 27; Glasser v. United States, 315 U.S. 60, 71, 62 S.Ct. 457, 465, 86 L.Ed. 680, 699 (1942); United States v. Pinc, 5 Cir. 1971, 452 F.2d 507.
 
 
 36
 In this case the government sought to compel the relators to tell the grand jury the names of unidentified persons who had arranged for bonds and legal fees on behalf of known persons. The amounts of these bonds were high in some cases as much as $100,000, thus necessitating large cash deposits. The amounts of those deposits were a matter of public record. In addition, the subpoenas required the relators to produce records as to the fees they had charged certain of the known clients. Some of these fees were also high for example, $12,000 in the case of one named defendant. The prosecutor asked each relator about his acquaintanceship with four individuals who were not among the named clients. The relators claimed the privilege in response to questions about those individuals. Finally, the prosecutor had already represented to the district court that the government possessed "information" about certain individuals who had paid out money to attorneys in excess of reported income. In the totality of these circumstances, and in the words of Baird, "(t)he names of the clients are useful to the government for but one purpose." Disclosure by the relators of the unidentified "patrons' " names would be directly relevant to corroborating or supplementing already-existent incriminating information about certain persons suspected of income tax offenses, regardless of those persons' possible complicity in marijuana traffic. If relators were compelled to disclose the sought-after items before the grand jury, the unidentified clients having been linked by their lawyers to payments in excess of reported income (the prosecutor need only produce their tax returns) might very well be indicted. In any event, the income tax aspects of the government's inquiry demonstrate a strong independent motive for why the unidentified clients could be expected to (1) seek legal advice, and (2) reasonably anticipate that their names would be kept confidential. The attorney-client privilege protects the motive itself from compelled disclosure, and the exception to the general rule protects the clients' identities when such protection is necessary in order to preserve the privileged motive.
 
 
 37
 We need not say a great deal more in order to decide this case on its peculiar facts. Some suggestion has been injected by the government that the relators do not actually represent the unnamed parties as clients i. e., that the relators were not really employed for the purpose of rendering legal services. This argument is raised for the first time on appeal, and we consider the point waived. In the court below, the district judge remarked on the matter to relators' counsel:
 
 
 38
 If you tell me, I am not going to question you. You need not put on any evidence. If you tell me in each instance on the motion to suppress they were in truth and in fact representing some other party as well. I have a suspicion that is what the Government is trying to show. You don't dispute that?
 
 Counsel for the government:
 
 39
 That is right.
 
 
 40
 Accordingly, we do not perceive a serious issue in this appeal with respect to the basic fact of representation. The district court adverted to no such issue in its memorandum opinion. In turn, the case in this posture raises no problem relating to the public policy factors listed by the Baird court, particularly factor (b) (identification relating to employment by a third party who is not a client or the client's agent), which might lend weight to a contrary result. See 279 F.2d at 632.
 
 
 41
 In conclusion, two brief notes of caution are in order. First, our decision should not be taken as any indication of how we would decide a similar question if the inculpatory value of sought-after testimony were less obvious or largely attenuated. Each of these cases must turn on its own facts. But second, and conversely, the government should not read this opinion as an invitation to tighten the web of secrecy surrounding its objectives and the nature and extent of information already in its hands when it calls lawyers to testify before prosecutorial bodies. The courts in this circuit will be ever vigilant to insure that they have adequate opportunities and sufficient helpful material in order to rule intelligently on these matters. Cf. United States v. Johnson, 5 Cir. 1972, 465 F.2d 793.
 
 
 42
 For the reasons herein discussed, the judgment of the district court is
 
 
 43
 Reversed.
 
 
 
 [1]
 28 U.S.C. § 1826. Recalcitrant witnesses
 (a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of
 (1) the court proceeding, or
 (2) the term of the grand jury, including extensions,
 before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.
 (b) No person confined pursuant to subsection (a) of this section shall be admitted to bail pending the determination of an appeal taken by him from the order for his confinement if it appears that the appeal is frivolous or taken for delay. Any appeal from an order of confinement under this section shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal.
 Added Pub.L. 91-452, Title III, § 301(a), Oct. 15, 1970, 84 Stat. 932.
 
 
 [2]
 A partial collation of the leading cases stating or applying the general rule includes the following: In re Michaelson, 9 Cir. 1975, 511 F.2d 882, 887-88, cert. denied, --- U.S. ---, 95 S.Ct. 1979, 44 L.Ed.2d 469 (1975) (but see n. 1 at 885, which distinguishes this case); United States v. Hodgson, 10 Cir. 1974, 492 F.2d 1175, 1177 (attorney's blanket refusal to respond to IRS summons for records pertaining to named, known client); United States v. Brickey, 8 Cir. 1970, 426 F.2d 680, 684-85, cert. denied, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970) (attorney allowed to testify that client, mail fraud defendant, caused checks to be mailed in order to purchase stock, for which purchase attorney was retained); In re Semel, 3 Cir. 1969, 411 F.2d 195, 197, cert. denied, 396 U.S. 905, 90 S.Ct. 220, 24 L.Ed.2d 181 (1969) (attorney bankrupt tried to conceal from referee information about his own accounts receivable); United States v. Bartone, 6 Cir. 1968, 400 F.2d 459, 461, cert. denied, 393 U.S. 1027, 89 S.Ct. 631, 21 L.Ed.2d 571 (1969) (attorneys testified about tax evasion defendant's transfers of funds through shell corporation; similar to Brickey insofar as evidence of ministerial function of attorneys was strong evidence of attorney-client relationship based on legal advice was weak or nonexistent); National Union Fire Ins. Co. of Pittsburgh v. Aetna Cas. & Surety Co., 1967, 127 U.S.App.D.C. 364, 384 F.2d 316, 317 n. 4 (fact of attorney-client relationship and reason for its existence generally are not privileged); Wirtz v. Fowler, 5 Cir. 1966, 372 F.2d 315, 332-33 (common-law privilege does not shield certain activities of attorneys on behalf of employer clients where LMRDA requires reporting of such activities); United States v. Goldfarb, 6 Cir. 1964, 328 F.2d 280, 281-82, cert. denied, 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964) (enlightened discussion; grand jury sought lawyer's testimony about real estate deal between suspect and witness-lawyer's client; questions did not call for disclosure of any communications from client himself privilege inapplicable); Colton v. United States, 2 Cir. 1962, 306 F.2d 633, cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963) (another blanket refusal to respond to IRS summons seeking records concerning named, known clients; good discussion but often loosely cited); McFee v. United States, 9 Cir. 1953, 206 F.2d 872, 876 (attorneys testified in tax evasion trial about receipts of cash from defendant and purchases of cashier's checks; evidence showed that the lawyers acted only as clerks or messengers); Behrens v. Hironimus, 4 Cir. 1948, 170 F.2d 627, 628 (in habeas corpus hearing initiated by convict claiming denial of counsel at trial, attorney was required to testify that petitioner had once consulted her); United States v. Pape, 2 Cir. 1944, 144 F.2d 778, 782, cert. denied, 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944) (famous case; attorney was required to testify that White Slave Act defendant had once employed him to represent a certain prostitute in another matter; Clark, J., for majority and L. Hand, J., dissenting make excellent arguments for each side); Goddard v. United States, 5 Cir. 1942, 131 F.2d 220, 221 (dicta; witness-client may not refuse to disclose identity of his attorney); United States v. Lee, C.C.E.D.N.Y.1901, 107 F. 702 (fugitive's counsel ordered to disclose to grand jury identity and address of third party who paid his fee; lawyer claimed that third party had become a client, but government then had no knowledge concerning any possible motive for why third party would seek personal legal advice; if third party is in fact a client, such motive is privileged). Other cases are cited and discussed in 8 Wigmore, Evidence § 2313 (McNaughton rev. 1961), and C. McCormick, Evidence § 90 (Clearly ed. 1972). On many occasions the general rule has been invoked rather mechanically to justify a result which was reached primarily for other reasons. Various rationales have been advanced in support of the general rule, see McCormick, supra, at 186-87, but "(t)heir reasoning is rather too general and not impressive, based as it is on some idea that the privilege does not apply to the creation of the relation (citation omitted)." Mauch v. Commissioner of Internal Revenue, 3 Cir. 1940, 113 F.2d 555, 556 (Clark, J.). In the end, the result in an individual case must turn on a balancing of society's interest in full disclosure against the policies which underlie the privilege. This requires particularized concern with the facts of each case. Prior decisions may offer little real help
 
 
 [3]
 Besides the Fourth, the Seventh, the Ninth, and our Circuit, other circuits have recognized that an exception may exist. E. g., United States v. Hodgson, 10 Cir. 1974, 492 F.2d 1175, 1177 ("This is not a case like Tillotson v. Boughner . . . where response to the summons would have revealed the identity of an unknown client. Here the client is named in the summons."); In re Semel, 3 Cir. 1969, 411 F.2d 195, 197, cert. denied, 396 U.S. 905, 90 S.Ct. 220, 24 L.Ed.2d 181 (1969) ("In the absence of unusual circumstances, the fact of a retainer, the identity of the client, the conditions of employment and the amount of the fee" are not privileged. (emphasis added)). Among the cases cited in Semel is Colton v. United States, 2 Cir. 1962, 306 F.2d 633, cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963), where, at 637, the court noted: "To be sure, there may be circumstances under which the identification of a client may amount to the prejudicial disclosure of a confidential communication, as where the substance of a disclosure has already been revealed but not its source." Colton cites, inter alia, Baird v. Koerner, supra. See also In re Kaplan, 8 N.Y.2d 214, 203 N.Y.S.2d 836, 168 N.E.2d 660 (1960); Ex parte McDonough, 170 Cal. 230, 149 P. 566 (1915)
 
 
 [4]
 Not the least example of which is the lawyer's probable duty to withdraw from the representation, thus posing a confrontation between the public's right to every man's evidence and the client's right to employ counsel of his own choosing. See ABA Code of Professional Responsibility, Canons 5 & 2, EC 5-10, DR 5-102(B), 2-110(B)(2)