**In re Douglas WILLIAMS, Greg Denaro, Sam Rabin, and Jose Quinon.**

**No. GJ 85–7(MIA).**

United States District Court, S.D. Florida.

Aug. 3, 1987.

## MEMORANDUM OPINION [1]

SCOTT, District Judge.

The Court is called upon to decide [2] the legality of grand jury subpoenas served upon the four above-named criminal defense attorneys. The subpoenas seek information relating to the amount of legal fees paid to the defense lawyers in the highly publicized first "River–Cops" trial.[3]

---

1. Upon motion of all parties these proceedings were conducted *in camera* due to the need for complete secrecy in on-going grand jury investigations. *See* Federal Rule of Criminal Procedure 6(e); *see also United States v. Sells Eng'r., Inc.,* 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743, (1983). The rule of secrecy has been deemed an important aspect of grand jury operations and while it may facilitate grand jury functioning, it serves "for the protection of the innocent as [well as] pursuit of the guilty."

2. This Court heard the motions in its capacity of assigned duty judge. Grand jury matters fall before the duty judge. General Rule 5.5(A)(1) (S.D.Fla.).

3. *United States of America v. Estrada,* 86–511–CR–RYSKAMP, 1987 WL 9454, is set for retrial in September, 1987.

The Attorney–Witnesses, the Intervenor–Clients, and Amici [4] oppose the subpoenas on various constitutional, privilege and policy grounds.[5] In particular, counsel for the Witnesses and Amici invite the Court to decide the matter in a classical constitutional context; namely, right to counsel [6] and grand jury abuse.[7] At the outset, the Court declines to accept the invitations to decide this matter on constitutional grounds [8] but, instead, focuses on the oldest and most basic of common law privileges—the attorney-client.

## I.

### THE ATTORNEY–CLIENT PRIVILEGE

Much has been written recently on prosecutors' subpoenaing criminal defense lawyers and its impact on the attorney-client relationship. DuMouchel, D., Odberg, C., *Defense Attorney Fees: A New Tool for the Prosecution*, Det.C.L.Rev. 57 (1986); Suni, *Subpoenas to Criminal Defense Lawyers: A Proposal for Limits*, 65 Or.L.Rev. 215 (1986); Note, *A Critical Appraisal of the Justice Department Guidelines for Grand Jury Subpoenas Issued to Defense Attorneys*, Duke L.J. 145 (1986); Note, *Grand Jury Subpoenas of a Target's Attorney: The Need for a Preliminary Showing*, 20 Ga.L.Rev. 747 (1986); Comment, *Second Circuit Rejects Need Requirement for Attorney Subpoena: In re Grand Jury Subpoena Served Upon John Doe, Esq. (Slotnick)*, 60 St. John's L.Rev. 524 (1986); Note, *The Grand Jury Subpoena: Is it the Prosecutor's "Ultimate Weapon" Against Defense Attorneys and Their Clients*, 13 Pepperdine L.Rev. 791 (1986). Courts and commentators alike have struggled with the conflicting considerations. The focus of the debate centers upon the Government's need to seek everyone's evidence as against the need to maintain the confidentiality of communications between attorney and client. *United States v. Dionisio*, 410 U.S. 1, 9–10, 93 S.Ct. 764, 769, 35 L.Ed.2d 67 (1973); *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972); *see* DePetris & Bachrach, *Subpoenas to Defense Attorneys—Responsible Prosecutional Approach*, N.Y.L.J. (April 30, 1980); Moscarino and Merkle, *Are Prosecutors Invading the Attorney–Client Relationship?* A.B.A.J. (September 1985) p. 38.

The Government contends that the information sought is not protected; such subpoenas are employed only sparingly and in accordance with Department of Justice guidelines and approval; and, in cases involving money-laundering and continuing criminal enterprise, proof of profits and unexplained wealth is essential. Criminal defense attorneys pointedly counter that subpoenaing lawyers is an assault upon an essential element of our justice system. They contend that such subpoenas are, in practice, a tool of intimidation used to break down the adversary system; accordingly, it is incumbent upon a responsible and ever vigilant judiciary to curb such abuse. Using this debate as a point of departure, a brief review of the applicable common law is in order.

### A. Background

The attorney-client privilege is a residual of over four hundred years of legal experi-

---

**4.** National Association of Criminal Defense Lawyers, Florida Criminal Defense Attorneys Associations and Cuban–American Bar Association have appeared and filed briefs in this matter.

**5.** The parties have favored this Court with extensive briefs and much thought provoking material. The briefs of the Florida Defense Lawyers Association and the Government are especially commendable.

**6.** *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 484–85, 88 L.Ed.2d 481 (1985); *In re Witness-Attorney Before Grand Jury, No. 83–1*, 613 F.Supp. 394 (S.D.Fla.1984).

**7.** *In re Grand Jury Subpoena Duces Tecum dated January 2, 1985 (Simels)*, 767 F.2d 26 (2d Cir. 1985); *United States v. Doe*, 455 F.2d 1270, 1275–76 (1st Cir.1972).

**8.** A fundamental rule of judicial restraint is that prior to reaching any constitutional question, federal courts must consider non-constitutional grounds for decision. "[I]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Jean v. Nelson*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); *Gulf Oil v. Bernard*, 452 U.S. 89, 99, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981).

ence. It is a creature of public policy. The privilege shields from disclosure confidential communications between attorney and client. 8 Wigmore § 2290–91 (McNaughton Rev.1961). The purpose of the privilege is to promote full and frank disclosure of necessary information. This "shield of confidentiality" provides a basis for faith, trust, and confidence between attorney and client. Clients understandably must believe that information provided to their attorneys will be kept confidential in order that they feel free to provide the information necessary for proper preparation of the case. *Upjohn v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981); *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *see also Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888). Only then are the ends of justice served.

The essential elements of the privilege are (a) an attorney-client relationship; and (b) confidential communication. *In re Grand Jury Proceedings (Jones),* 517 F.2d 666, 670 (5th Cir.1975); *United States v. Ponder,* 475 F.2d 37, 39 (5th Cir.1973). The party invoking the privilege has the burden of establishing the attorney-client relationship and the confidential nature of the communication. *In re Grand Jury Proceedings in Matter of Freeman,* 708 F.2d 1571, 1575 (11th Cir.1983).

The subpoenaing of lawyers to provide fee information has been addressed by several circuits in recent history, often with divergent results. *In re Grand Jury Subpoena Service Upon Doe,* 759 F.2d 968, 971 (2d Cir.1985); *United States v. Liebman,* 742 F.2d 807 (3d Cir.1984); *In re Shargel,* 742 F.2d 61 (2d Cir.1984); *In re Ousterhoudt,* 722 F.2d 591 (9th Cir.1983); *In re Grand Jury Proceedings (Gordon),* 722 F.2d 303 (6th Cir.1983), *cert. denied,* 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). While these opinions are in-

structive and properly may be used as analogues, they are not binding. It is for this reason that the following discussion will primarily concern itself with controlling precedent from the Eleventh Circuit Court of Appeal and its predecessor Fifth Circuit.[9]

### B. *Prior Circuit Precedent*

In this circuit, the seminal decision is *In re Grand Jury Proceedings (Jones),* 517 F.2d 666, 670 (5th Cir.1975). While not the original case to address the present issue, *see, e.g., United States v. Ponder,* 475 F.2d 37, 39 (5th Cir.1973); *United States v. Finley,* 434 F.2d 596 (5th Cir.1970), *Jones* established the basic legal principles for analyzing a claim of attorney-client privilege.[10] A review of the subsequent cases reveals that *Jones* continues as the operative framework for analysis.[11]

*Jones* teaches that lawyers' fee arrangements are generally not protected by the privilege. Nevertheless, the court recognized that in "exceptional circumstances," fee information may be privileged. "Just as the client's verbal communications are protected, it follows that other information, not normally privileged, should also be protected when so much of the substance of the communications are already in the Government's possession that additional disclosures would yield substantial probative links in an existing claim of inculpatory events or transactions." *Jones,* 517 F.2d at 674.

*Jones* recognized that cases of this nature present "discrete" issues which must be given considered thought before resolution. There must not be a wooden application of an automatic rule. "On many occasions the general rule has been invoked rather mechanically to justify a result which was reached without more thoughtful analysis." *Id.* at 671 n. 2. Each controversy must be decided on a case-by-case

---

**9.** The Eleventh Circuit in the *en banc* decision of *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**10.** For an excellent early case, where true legal giants debated the issue, *see United States v.*

*Pape,* 144 F.2d 778, 782 (2d Cir.), *cert. denied,* 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944) (Clark, J., for majority, Hand, J., dissenting).

**11.** Indeed, this Court's research reveals that every Eleventh Circuit decision to discuss the issue has cited *Jones* with approval.

basis bottomed on its own peculiar facts, "... since the purpose of the privilege—to suppress the truth—runs counter to the dominant aims of the law." *Id.* at 671–72.

In a subsequent Fifth Circuit opinion, *In re Grand Jury Proceedings (Pavlick),* 680 F.2d 1026 (5th Cir.1982) *(en banc )* which is not binding here but has been approved by the Eleventh Circuit, *In re Grand Jury Proceedings (Twist),* 689 F.2d 1351, 1352 (11th Cir.1982) ("This Court is not bound by *Pavlick* ... but we approve its reasoning.") the Court limited the "exceptional circumstances" discussed in *Jones* to what has now been termed the "last link" exception. "There we also recognized, however, a limited and narrow exception to the general rule, one that obtains when the disclosure of the client's identity by his attorney would have supplied the last link in an existing chain of incriminating evidence likely to lead to the client's indictment." *Pavlick,* 680 F.2d at 1027. *See also United States v. Clemons,* 676 F.2d 124, 125 (5th Cir.1982); *In re Grand Jury Proceedings In Matter of Fine,* 641 F.2d 199, 203 (5th Cir.1981).

Since its creation, the Eleventh Circuit has found itself considering this issue routinely. *United States v. Innella,* 821 F.2d 1566 (11th Cir.1987); *In re Grand Jury Subpoena (Bierman),* 765 F.2d 1014 (11th Cir.1985), vacated in part, 788 F.2d 1511 (11th Cir.1986); *In re Grand Jury Investigation (Harvey),* 769 F.2d 1485 (11th Cir. 1985); *In re Grand Jury Proceedings in Matter of Freeman,* 708 F.2d 1571 (11th Cir.1983); *In re Slaughter,* 694 F.2d 1258 (11th Cir.1982); *In re Grand Jury Proceedings (Twist),* 689 F.2d 1351 (11th Cir. 1982).[12] Scrutiny of these decisions reveals that the Eleventh Circuit approved the "last link" as an available but rarely employed exception; has continued to apply a probing case-by-case analysis as required

by *Jones,* and, at the same time, given considerable credence to the trial judge's decision; [13] has rejected any government invitation to abolish or narrow the exception; and has consistently refused to apply the exception where there is even a hint of crime or fraud by the attorney invoking the privilege.

Reading these decisions in their totality, a pattern emerges that the circuit will not tolerate use of the privilege to frustrate the legitimate ends of law enforcement in seeking the truth,[14] save for those situations where a true confidential setting would be invaded. A last link of incriminating evidence provides such a setting. The question remains, therefore, whether the present subpoenas served upon the four putative witnesses constitute just such a setting. The answer to this question, in turn, requires particularized concern with the facts of this case.

II.

HISTORY OF THE CASE

A short procedural history of this litigation reveals the following:

1. Between October and December of 1985, the Witnesses were contacted by their future clients with respect to representation in a contemplated criminal action to be brought by the State of Florida.

2. Prior to initiating these charges, the State Attorney's Office commenced an extensive investigation. The State served literally hundreds of subpoenas seeking financial information from banks, merchants and even family members of the Defendants. The State also subpoenaed safety deposit boxes and, in some instances, uncovered large amounts of currency. From the outset of the case, the specific assignment of Richard Jaffee, a criminal investi-

12. The frequency with which the Court confronts this issue appears to parallel the unfortunate rise in the number of criminal investigations into money-laundering, drug trafficking and RICO violations.

13. Every case reported was an affirmance of the district judge, regardless of whether the lower court's decision was to quash the subpoena or not.

14. "[W]e decline to permit the promise of legal services to be made a fringe benefit for use in recruiting criminal conspirators. Lawyers' skills may not be employed, even without their knowledge, in furthering crimes." *Pavlick,* 680 F.2d at 1028–29.

gator and former Internal Revenue Service Officer, was to conduct a financial investigation of the subjects and their associates to determine if the Defendants were spending money or accumulating assets in excess of that attributable to their legitimate sources.

3. On December 27, 1985, the Dade State Attorney's Office filed an information in Dade County Circuit Court, charging six City of Miami policemen ("the Defendants") with RICO, drug trafficking and larceny violations. In March, 1986, another Defendant was added.

4. In late May, 1986, the State requested that the United States Attorney's Office for the Southern District of Florida take over the investigation. One of the announced reasons given for the change in forum was that the federal government could more properly investigate and charge the Defendants. "While the case began as one incident resulting in three deaths, it has evolved into a RICO case involving multiple episodes resulting in many violations of federal as well as state law." Nolle Prosse Report p. 2.

5. On June 12, 1986, GJ 85–7 (MIA) returned an indictment against the same seven policemen. The indictment charged them with violations of RICO, 18 U.S.C. 1961, drug trafficking, 21 U.S.C. 846 and 841(a)(1), and civil rights violations, 18 U.S.C. 242.

6. In July and August, 1986, GJ 85–7 (MIA), continuing its investigation, subpoenaed additional financial documents. On September 4, 1986, GJ 85–7 (MIA) returned a superseding indictment against the original seven Defendants, and added new charges of tax evasion against three Defendants.

7. On motion of the Defendants, these new charges were severed from the indictment because they came within the thirty day "grace period" provided in the Speedy Trial Act. Concomitantly, Judge Kenneth L. Ryskamp denied the Government's motion to continue the trial. It was obviously of paramount importance for Judge Ryskamp to keep the trial date of September 29, 1986.

8. Trial commenced on schedule and lasted fifteen weeks until January 21, 1987. A mistrial was declared after the jury was unable to reach a unanimous verdict. Significantly, the vote was 10–1 for conviction. The relevant details of the trial will not be discussed at this point, but suffice it to say, it was hotly contested.

9. In February and March, 1987, all of the attorneys for the Defendants, including the subpoenaed Witnesses, moved to withdraw as counsel. While the motions contain various grounds, the true basis was that none of the lawyers could afford to repeat another five-month trial. The motions were granted and the Witnesses withdrew as counsel in Case No. 86–511–CR–RYSKAMP.[15] In March, 1987, new attorneys were appointed for those Defendants who requested representation and "standby" attorneys for those Defendants who did not request representation.

10. On April 14, 1987, GJ 85–7 (MIA) issued subpoenas duces tecum commanding the four Witnesses to appear before the Grand Jury and bring the following documents:

Any and all records pertaining to fees paid by or for [the Defendant] during the period of January 1, 1985 to the present including but not limited to:

1. Receipts.
2. Copy of Remittance checks.
3. Accounts receivable ledgers/journals.
4. IRS forms 8300.
5. Deposit Tickets.
6. Invoices.
7. Correspondence relating to fee.

The subpoenas were served by criminal investigator Richard Jaffee, who initiated the state's investigatory efforts into financial matters now some two years ago. Senior Litigation Attorney and lead counsel for the Government advised the Court that the

---

**15.** The Government moved for production of sealed materials, to wit: any *in camera* transcripts concerning the reasons for withdrawal by counsel. Judge Ryskamp advised this Court that no *ex parte,* or *in camera* hearings were conducted with respect to the issue of the attorneys' Motion to Withdraw.

subpoenas were part of the on-going investigation of GJ 85–7 (MIA) relating to violations of Title 26 U.S.C. § 7201 (tax evasion) and Title 26 U.S.C. § 7203 (failure to file) for the years 1985 and 1986 of each of the four Defendants previously represented by the Witnesses. Notably, none of the remaining three counsel whose clients had been previously indicted on tax charges was subpoenaed.

11. Motions to quash the subpoenas were filed by the four Witnesses in a timely manner. The four clients moved to intervene. This Court stayed compliance with the subpoenas until these motions were resolved and ordered a briefing and hearing schedule.

12. On May 7, 1987, GJ 85–7 (MIA) returned another superseding indictment. The indictment added an eighth Defendant and additional allegations against various of the other Defendants.

## III.

## CONFIDENTIAL COMMUNICATIONS AND TRIAL PROOF

The Witnesses argue that production of their four separate sets of fee information would provide the last probative link of incriminating evidence leading to the conviction of these Defendants.[16] They cite to the proof and issues at the first trial as evidence of this contention.[17] The Court's independent review of the extensive materials provided by the parties demonstrates that the Witnesses' position has merit because (a) the fee discussions, under the exceptional facts of this case, were confidential communications; and (b) the issues, evidence and outcome of the first trial confirm that production of this fee information would constitute the last link of evidence

leading to the almost certain conviction of these Defendants.

### A. Confidential Communications

From the inception, the parties were well aware that an important aspect of the Government's investigation was the Defendants' financial resources. Even prior to indictment, the State had served over two hundred subpoenas covering every conceivable source of financial information concerning the Defendants. Cash had been discovered and seized out of safety deposit boxes. The thrust of the Government's investigation was patently obvious—unexplained wealth.

Given this background, any initial discussions between attorney and client were undertaken necessarily with an understanding that the amount of the fee to be charged and the methods of payment would be inextricably intertwined with the subject of the criminal investigation.[18] Once the charges were filed, the Government's interest in the Defendants' financial condition was confirmed. At the time the Witnesses were retained to represent the Defendants in the state and subsequent federal proceedings, the parties were well aware that any discussions which they had relating to the fee to be charged in the case and the manner of payment could not be separated from discussions concerning the operative facts of the case itself. The fee discussions were therefore an integral part of the confidential communication between attorney and client.

### B. Trial Proof

At trial, the Government's case, as expected, was bottomed on the Defendants' having amassed large sums of cash through narcotics deals, secreting unlawful

---

**16.** While the last link exception speaks typically in terms of "leading to indictment," it seems obvious that where, as here, the evidence may not only lead to indictment (new tax evasion charges) but also conviction on RICO counts (and a penalty of up to life imprisonment), the rule should have even more application.

**17.** Unlike prior precedent, determination of this issue in this case comes with a distinct advantage—hindsight! This Court has the benefit of a prior trial proceeding to assess the impact of the subpoenaed evidence.

**18.** On June 9, 1987, and June 10, 1987, this Court conducted extensive *in camera* hearings regarding the communications initially relayed to defense counsel from their respective clients. Upon careful consideration of the contents of these discussions, this Court is convinced that the parties were verily cognizant that divulging the amount of the fee and the form of payment would be fatally damaging to their defense. As a result, great effort was expended to preserve the communications' confidentiality.

profits and using the money to enhance their life styles. The importance of financial evidence to the Government's case was brought to issue when, in response to a defense motion to limit the presentation of such proof, the prosecution responded:

> Finally, when viewed as a whole, the Government's financial evidence presents a compelling scheme whereby the defendants employed families and in some cases identical methods to "launder" their drug proceeds. This financial evidence is patent corroboration of the direct cash accumulations and compelling circumstantial proof of the allegations. *Response Memorandum of the Government,* p. 3.

When the trial judge denied the defense motion, this ruling paved the way for fifteen weeks of evidence of unexplained wealth, hidden assets and cash transactions. The most credible proof and indeed the very heart of the Government's argument were the expenditures and financial records. This was the theme from arrest to summation.

In the aftermath of the prior jury's 10–1 vote for guilty, it is difficult to believe that the Government can seriously contend that such potentially prejudicial evidence as the amount of legal fees paid for representation in the very case for which the Defendants are on trial, would not constitute the last link of proof needed for conviction. One can hardly imagine more devastating evidence. Indeed, one can hardly imagine a more compelling situation for invoking the privilege. If ever there was a setting to apply the last link exception, this is the one.

One could easily envision the following scenario: The Government calls as its last four witnesses, the four former attorneys of the Defendants on trial.

(Direct examination)

Q. Do you know the Defendant?

A. Yes.

Q. How did you come to know him?

A. I was his former attorney.

Q. In what matter?

A. This case.

Q. Did you receive a fee?

A. I did.

Q. How much was your fee?

A. $225,000.[19]

Q. In what form was the fee paid?

A. Cash.

Q. In what denominations?

A. Small bills.

Q. Is that the same fee which Mr. Arias, the accomplice, testified to earlier in this trial?

A. Yes.

Q. So it would be correct to say that you, as the Defendant's former lawyer, are able to corroborate the main accomplice's testimony?

A. Yes.

No further questions of this witness.

Picture this scene repeated four times. It would not take an accomplished soothsayer to predict the outcome of the trial. It is self-evident. The fee information testimony from the prior lawyers would shore up several important aspects of the Government's case: (a) it would corroborate[20] the testimony of key Government witnesses including Armando Un and Pedro Ramos, and, even more importantly, the accomplice Rudy Arias;[21] (b) it would demonstrate the motive of the Defendants for engaging in the alleged conduct, i.e., personal profit; and (c) it would constitute the coup de grace for the Government's evidence on unexplained wealth and cash assets. In short, it would tie up all the loose ends and provide the final piece of

---

**19.** The amount is used by way of a hypothetical response, not suggesting in any way the probable answer.

**20.** That corroborative evidence can establish the last link is beyond dispute. *Jones,* 517 F.2d at 673–74 (Disclosure by the attorneys of the information "would be directly relevant to corroborating or supplementing already-existent incrim-

inating information about certain persons suspected of criminal offenses.")

**21.** The credibility of Un and Ramos was a major point of contention in the first trial. Their credibility was severely attacked on cross-examination. Evidence of cash paid for legal fees by these Defendants would forge a piece of unassailable evidence corroborating their testimony.

uncontestable evidence that the Government could point to with authority ·in its summation.

## IV.

### CONCLUSIONS OF LAW

The Southern District is not unfamiliar with this type of litigation. *In re Grand Jury Subpoena (Leen)*, 642 F.Supp. 230 (S.D.Fla.1986) (Aronovitz, J.); *In re Witness–Attorney Before Grand Jury No 83–1*, 613 F.Supp. 394 (S.D.Fla.1984) (Hoeveler, J.); and, *In re Witness Before Grand Jury No. 82–5*, 558 F.Supp. 1089 (S.D.Fla.1983) (Spellman, J.). Nor is this Court. *United States v. Denaro (In re the Matters of Tax Liability of Mitchell E. Jacobs)*, 647 F.Supp. 112 (S.D.Fla.1986) (Scott, J.) involved a challenge to a subpoena served upon an attorney to produce fee information of a former client. An objection was raised based upon the attorney-client privilege founded on the last link exception. This Court rejected that challenge and ordered production of the fee information. The taxpayer there had failed to meet his burden of demonstrating a privilege which would justify avoiding the general rule that fee production is required. *In re Grand Jury Proceedings in Matter of Freeman*, 708 F.2d 1571 (11th Cir.1983). This case presents a different setting.

*In re Grand Jury Proceedings (Jones)*, 517 F.2d 666, 670 (5th Cir.1975) and its progeny teach that it is incumbent upon a district judge to make a searching inquiry into the facts of each case. "The true difficulty comes not in listing the necessary ingredients, but in applying the usual tests to unique fact situations." *Id.* at 670. And, *Jones* further observed, "[p]rior decisions may offer little real help." *Id.* at 671 n. 2. The latter observation is certainly true in light of the peculiar facts of each individual case.

Here, the Court has concluded that notwithstanding the prosecutor's desire to obtain evidence in search of the truth, the policies which underlie the privilege compel quashing of the subpoenas served upon the four Witnesses. These attorneys were hired as trial counsel to defend their clients in the very case in which they are now potential witnesses. *Freeman, supra; In re Grand Jury Proceedings In Matter of Fine*, 641 F.2d 199, 203 (5th Cir.1981); [22] *see In re Grand Jury Subpoena (Leen)*,[23] 642 F.Supp. 230 (S.D.Fla.1986). They were not hired to perform a peripheral chore of laundering ill-gotten gains, bonding out an arrestee for an undisclosed client or hiding assets, as in most of the prior decisions.[24] *In re Grand Jury Investigation (Harvey)*, 769 F.2d 1485 (11th Cir.1985); *Freeman, supra; In re Slaughter*, 694 F.2d 1258 (11th Cir.1982); *In re Grand Jury Proceedings (Twist)*, 689 F.2d 1351 (11th Cir. 1982). *But cf. In re Grand Jury Subpoena Bierman*, 765 F.2d 1014 (11th Cir.1985), vacated in part, 788 F.2d 1511 (11th Cir. 1986). There is not the slightest hint of such odious conduct by these attorneys. If there were, a different result would obtain.[25] In short, four experienced trial law-

**22.** The current legal relationship of these Witnesses to the Defendants has been an issue in these proceedings. All four attorneys still claim some specie of attorney-client association. For example, Douglas Williams is representing Osvaldo Coello on a bond appeal and in a state criminal case. Greg Denaro has continued to advise the newly appointed stand-by attorney at a bond hearing and has advised the Court he will do so again in future proceedings. However, the Court need not reach this issue in light of its disposition on other grounds.

**23.** "The client's name and fee arrangements become privileged communication only if disclosure would implicate the client in the very criminal activity for which criminal address is sought." *Fine, supra* at 204.

**24.** The four Witnesses argue that the timing of these subpoenas is highly suspect; and, this is an additional factor which this Court should consider in determining the prosecution's good faith and motivation. *See In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir.1985); *United States v. Kovaleski*, 406 F.Supp. 267 (E.D.Mich. 1976). While the timing does appear to raise justiciable questions, this issue need not be reached.

**25.** "An attorney who acts as his client's business advisor, or his agent for receipt or disbursement of money or property to or from third parties, is not acting in a legal capacity; and records of such transactions are not privileged." *Harvey, supra*, at 1488. (citing with approval *United States v. Davis*, 636 F.2d 1028, 1044, *rehearing denied*, 645 F.2d 71 (5th Cir.1981)).

yers were hired to defend a difficult case, and they performed that task.

In assessing the facts, the Court takes due notice that no less than four attorneys were subpoenaed to appear before the grand jury. Each is well known as a capable and aggressive trial counsel. To say the least, this controversy and, in particular, the first trial, has been highly publicized. While four attorneys are a small nucleus of the Miami legal community, under the exceptional factual setting of this controversy, these four subpoenas have had a dramatic impact well beyond their number. In light of this backdrop, the action of the Government constitutes a broad attempt to "canvas" the attorneys for information and, as a consequence, undermines severely the salutory purpose behind the attorney-client privilege. *See Jones, supra;* and *Pavlick, supra.*

The Government contends that fee information cannot be a confidential communication. The Government argues that last link is an aberration in the law because it has no relationship to a confidential communication which is an essential aspect of the privilege. To accept this contention would be to abrogate the last link exception, and, in effect, adopt an automatic rule [26] that fee information must be produced in every instance. This is something that this Court—indeed, most courts—have rejected.[27] There must be a "safety-valve" exception which forbids production of otherwise relevant information in those instances where the privilege would be compromised.

In any case, the rationale behind the last link rule is obvious. An attorney should not be placed in the position of being the essential witness who puts the criminal case together for a successful prosecution.

Here, the Government's case is complete except for fee information. The Government already possesses every other aspect of the Defendants' financial evidence. Indeed, the financial evidence already possessed by the Government lead to the very brink of conviction. The prior jury hung by the narrowest of margins in favor of conviction, 10–1. Testimony from these Witnesses concerning the fees each Defendant paid in the very case for which they are on trial would provide the final link in the Government's proof of the Defendants' unexplained wealth. Where the Government's case against a suspect is complete except for a matter arising out of the confidential relationship, that matter must be privileged.

## V.

### EPILOGUE

In summary, there is nothing typical about this case. From its inception, through the mistrial, and, certainly with the prospect of a second trial, it promises to present an ever unfolding melodrama. With this background, it is therefore not surprising that this Court would ultimately conclude that these facts fall within the exceptional circumstances required to find a last link. While conceding that the availability of the privilege is unusual in cases of this nature, "[n]evertheless [I] emphasize [my] satisfaction that the facts and circumstances revealed by this record amply justifies the availability of the privilege." *Jones,* 517 F.2d at 668. Accordingly, it is Ordered and Adjudged as follows:

1. Motion[s] to Quash Subpoenas served upon Witnesses Douglas Williams, Greg Denaro, Sam Rabin and Jose Quinon are GRANTED. The subpoenas duces tecum

---

**26.** "The exception, however, though sometimes difficult to grasp and apply, is not quite so confined as the government would make it. The government and the court below have taken the position that a client's identity, fee and bonding arrangements can never be privileged unless disclosure would lead automatically to conviction for a criminal offense. That is not the law." *Jones, supra,* at 679.

**27.** It is noteworthy that even in a prior appeal in this litigation, the circuit court acknowledged

the last link exception in an unpublished order, although ultimately concluding that the particular facts did not support its application. *In re Grand Jury Proceedings, Ricardo Aleman,* No. 86–5605. (August 6, 1986) ("With respect to the appellant's motion to quash the subpoena directed to his former attorney, this Court does have jurisdiction, but the motion to quash is denied on the merits. Appellant has not established that the former attorney's testimony would constitute the last link.")

issued by GJ 85–7 (MIA) upon these four Witnesses are quashed based upon the attorney-client privilege.

2. The Court reserves ruling on all other arguments and issues in light of the disposition on non-constitutional grounds.

3. A contemporaneous order will be issued on remaining non-dispositive motions.

4. With the exception of this Memorandum Opinion, all other contents of the grand jury proceeding will remain under seal until further order of a court of competent jurisdiction.

5. The Court retains jurisdiction to effectuate the terms of this order.

DONE and ORDERED.