## In re GRAND JURY PROCEEDINGS.

**Sam RABIN, Witness–Appellee,**

v.

**UNITED STATES of America, Movant–Appellant.**

**No. 88–5056.**

United States Court of Appeals, Eleventh Circuit.

March 2, 1990.

As Amended April 3, 1990.

Order on Grant of Rehearing En Banc May 16, 1990.

Leon B. Kellner, U.S. Atty., Mayra Reyler Lichter, Michael P. Sullivan, Linda C. Hertz, Asst. U.S. Attys., Miami, Fla., for movant-appellant.

Arthur Joel Berger, Miami, Fla., for witness-appellee.

Before TJOFLAT, Chief Judge, VANCE *, Circuit Judge, and PITTMAN **, Senior District Judge.

PER CURIAM:

Samuel Rabin, appellee, received a subpoena duces tecum from a grand jury investigating the activities of his former client, Armando Garcia. The subpoena ordered Rabin to appear before the grand jury and to produce certain documents relating to the amount of fees Garcia paid Rabin during the investigation and trial of pending federal criminal charges. Rabin moved the district court to quash the subpoena, and the court granted that motion. The Government now appeals. We reverse and remand.

### I.

This appeal arises out of the highly visible prosecution of seven Miami police officers known as the "River Cops." An intensive investigation by the Dade County

---

* Judge Robert S. Vance was a member of the panel which heard oral argument but due to his death on December 16, 1989 did not participate in this decision. This case is decided by a quorum. *See* 28 U.S.C. § 46(d).

** Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

State Attorney's Office culminated in the filing of an information in the Dade County Circuit Court on December 27, 1985. The information contained various RICO, drug-trafficking, and larceny charges against six of the officers. One of those officers, Armando Garcia, was Rabin's client. Apparently, during the investigation, Garcia had contacted Rabin for the purpose of hiring Rabin to provide a defense against the forthcoming charges. In March 1986, another defendant was added.

In May 1986, the State Attorney's Office turned the investigation over to the United States Attorney's Office for the Southern District of Florida. On June 12, 1986, a federal grand jury returned an indictment against the seven officers, charging them with RICO, drug-trafficking, and civil rights violations. Simultaneously, the State Attorney's Office, citing the federal government's involvement in the case, made public a nolle prosse report. The grand jury continued its investigation into the activities of the seven officers by issuing subpoenas for additional financial records, and on September 4, 1986, it returned a superseding indictment against the officers that also contained tax evasion charges against three of the officers. Garcia was one of the four officers not indicted at that time for tax evasion.

The tax evasion charges were severed from the original charges, and the case went to trial on the RICO, drug-trafficking, and civil rights charges on September 29, 1986. The trial lasted fifteen weeks and resulted in a mistrial when the jury failed to reach a unanimous verdict. In February and March 1987, all of the officers' attorneys, including Rabin, filed motions to withdraw as counsel, and those motions were granted. The court appointed new attorneys for those officers who requested counsel and appointed standby attorneys for those officers who did not request counsel.

The Government elected to retry the case on the pending charges, and the grand jury continued its investigation into the officers' activities. As part of its continuing investigation into possible tax evasion and failure to file income tax returns, the grand jury issued subpoenas duces tecum to the four former attorneys of those officers who had not been charged with tax evasion in the 1986 superseding indictment. Thus, Rabin was among those attorneys subpoenaed. The subpoenas commanded the attorneys to appear before the grand jury and to produce

> [a]ny and all records pertaining to fees paid by or for [the officer-defendant] during the period of January 1, 1985 to the present including but not limited to:
> 1. Receipts.
> 2. Copy of remittance checks.
> 3. Accounts receivable ledgers/journals.
> 4. IRS forms 8300.
> 5. Deposit tickets.
> 6. Invoices.
> 7. Correspondence relating to fee.

The four attorneys jointly moved to quash the subpoena, arguing that enforcement of the subpoena would intrude on the attorney-client privilege, violate the officers' sixth amendment right to counsel, and constitute an abuse of the grand jury. The four officers moved to intervene, but only two were allowed to do so: Garcia's motion to intervene was denied. The district court received written briefs and heard oral argument on the motion to quash the subpoenas and, in a memorandum opinion, granted the motion. *See In re Williams,* 717 F.Supp. 1502, 1510 (S.D.Fla.1987). The court based its decision on the last link doctrine of the attorney-client privilege, holding that, under *In re Grand Jury Proceedings (Jones),* 517 F.2d 666, 670 (5th Cir.1975)[1] and its progeny, the requested information might constitute "the [last] link in the Government's proof of the [officers'] unexplained wealth." 717 F.Supp. at 1510. The court reserved decision on the other arguments advanced in support of quashing the subpoenas. *Id.* at 1503. The

---

1. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**1270**

Government appeals the court's order with regard to the subpoena issued to Rabin.

We think that the district court misapplied the last link doctrine to the information in Rabin's possession and that the attorney-client privilege does not shield the requested information from discovery by the grand jury. Because we hold that the attorney-client privilege cannot support Rabin's motion to quash the subpoena, we must address the other arguments advanced in support of that motion. Accordingly, we hold that Rabin's sixth amendment claim is not yet ripe for judicial determination and that Rabin lacks article III standing to raise that claim. Furthermore, we hold that enforcement of the subpoena does not constitute an abuse of the grand jury. We therefore reverse the district court's order quashing the subpoena and remand the case for further proceedings.

In part II, we address the district court's holding that the requested information is protected by the attorney-client privilege. In part III, we discuss why article III and prudential concerns prevent the litigation and determination of Rabin's sixth amendment claim. Finally, in part IV, we explain why enforcement of this subpoena does not constitute an abuse of the grand jury.

## II.

### A.

When determining the reach of the attorney-client privilege, we look to "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. From those principles, we learn that the attorney-client privilege—the oldest of the confidential communication privileges—exists "[i]n order to promote freedom of consultation of legal advisers by clients." 8 J. Wigmore, Evidence § 2291, at 545 (McNaughten rev. ed. 1961); see United States v. Suarez, 820 F.2d 1158, 1160 (11th Cir.), cert. denied, 484 U.S. 987, 108 S.Ct. 505, 98 L.Ed.2d 503 (1987). Sound legal advice and advocacy depend upon full and frank communication between attorney and client. See Upjohn

Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The attorney-client privilege, however, is inconsistent with the goal of discovering the truth at trial and, therefore, "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." United States v. Pipkins, 528 F.2d 559, 563 (5th Cir.1976) (quoting In re Horowitz, 482 F.2d 72, 81 (2d Cir.) (quoting in turn 8 J. Wigmore, supra § 2291, at 554), cert. denied, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973)), cert. denied, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976).

■ In light of these principles, courts have been careful to define "communication" between attorney and client to include only those verbal statements or physical acts that the client intends as information regarding the "subject matter" of his problem. See, e.g., Modern Woodmen of Am. v. Watkins, 132 F.2d 352, 354 (5th Cir.1942); see also 8 J. Wigmore, supra § 2306, at 590. Thus, courts have distinguished between underlying facts—facts existing independently of any communication between the attorney and client—and communications about those facts, extending the privilege to the latter but not the former. See, e.g., Upjohn Co., 449 U.S. at 395–96, 101 S.Ct. at 685–86; see also C. Wolfram, Modern Legal Ethics 261 (1986).

### B.

■ This brings us to the last link doctrine. Because courts generally refuse to extend the privilege to underlying facts, the identity of an attorney's client has rarely been held to be a privileged communication. See generally 8 J. Wigmore, supra § 2313, at 609–10. The Ninth Circuit, however, in Baird v. Koerner, 279 F.2d 623 (9th Cir.1960), announced a notable exception to this general rule. In Baird, several clients, who apparently believed they had underpaid their federal taxes, retained the services of an attorney for the purpose of making an anonymous payment to the IRS. The attorney sent a cashier's check, along with a letter explaining the situation, to the IRS. An IRS special agent then requested the identities of the attorney's clients, but

the attorney refused to divulge their identities, arguing that those identities constituted confidential communications protected by the attorney-client privilege.

The Ninth Circuit agreed with the attorney. In an oft-quoted passage, the court noted that

> [t]he names of the clients are useful to the government for but one purpose—to ascertain which taxpayers think they were delinquent, so that it may check the records for that one year or several years. The volunteer nature of the payment indicates a belief by the taxpayers that more taxes or interest or penalties are due than the sum previously paid, if any. *It indicates a feeling of guilt for nonpayment of taxes, though whether it is criminal guilt is undisclosed.* But it may well be the link that could form the chain of testimony necessary to convict an individual of a federal crime. *Certainly the payment and the feeling of guilt are the reasons the attorney here involved was employed—to advise his clients what, under the circumstances, should be done.*

*Id.* at 633 (emphasis added). Because disclosure of the clients' identities "would disclose the 'ultimate motive of litigation' which Wigmore says the privilege should protect," [2] the court held the clients' identities to be privileged. *Id.* at 630.[3]

The former Fifth Circuit adopted the last link doctrine in *United States v. Jones (In re Grand Jury Proceedings)*, 517 F.2d 666 (5th Cir.1975). In *Jones*, a federal grand jury issued subpoenas directing certain attorneys to disclose "all records, retainer agreements, books, records, and/or receipts showing payment of attorneys' fees" for several named clients who had either been convicted or were under arrest or indictment for drug-related offenses. *Id.* at 668. The attorneys, however, refused to answer questions or produce documents that would disclose the identity of certain

other, unidentified clients, claiming that the identities of those clients were protected by the attorney-client privilege. *Id.* at 669. The court began by noting that information regarding a client's identity and the amount of fees paid is normally not privileged. *Id.* at 670–71. The court explained, however, that

> [j]ust as the client's verbal communications are protected, it follows that other information, not normally privileged, should also be protected when so much of the substance of the communications is already in the government's possession that additional disclosures would yield substantially probative links in an existing chain of inculpatory events or transactions. The client may reasonably expect the lawyer to maintain silence in such circumstances, for disclosure could drastically diminish the value of legal discussions or planning that took place previously, or at least alter the course of subsequent strategy.

*Id.* at 674 (footnote omitted). Since disclosure of the clients' identities in those circumstances would reveal their (presumably incriminating) motive for seeking legal advice, the court held that the last link doctrine protected the clients' identities. *Id.* at 674–75. As the court stated: "The attorney-client privilege protects the motive itself from compelled disclosure, and the exception to the general rule protects the clients' identities *when such protection is necessary in order to preserve the privileged motive.*" 517 F.2d at 674–75 (emphasis added).

The *Baird* and *Jones* cases together demonstrate a crucial point that the district court here failed to grasp. When we read the above passages in conjunction with the "last link" language in *Baird* and *Jones*, we see that those courts were not concerned with whether the clients' *identities* constituted an incriminating last link, but whether the clients' *motive* for retaining

---

2. Although Wigmore discussed only the motive of litigation, the *Baird* court extended his reasoning to a client's motive for retaining the services of an attorney.

3. Although the two extracts in the text are drawn from two different parts of the *Baird* opinion, the first dealing with state law and the second dealing with federal law, this circuit has treated the entire opinion as part of the federal law of evidence. *See Jones,* 517 F.2d at 671.

1272

the attorneys' services constituted an incriminating last link. A client's motive for hiring a lawyer normally will be privileged, but the privilege may be invoked in a given case only if, under the circumstances of the case, the client expected his motive to be kept confidential. *See* 8 J. Wigmore, *supra*, § 2311, at 600. In *Baird* and *Jones*, the courts held that when disclosure of the client's identity would necessarily disclose the client's motive, and when the client would expect the attorney to hide the client's identity because disclosure of his identity would disclose his incriminating motive, then the client's identity becomes privileged. In other words, the incriminating nature of the client's motive creates a reasonable expectation in the client that his identity will be kept confidential. In contrast, when disclosure of the client's identity would not disclose *other privileged information* (e.g., motive), the general rule applies and the information regarding identity is not privileged even if disclosure of that information itself might be incriminating. Viewed in this light, *Baird* and *Jones* do not create an exception to the general rule that client identities are not privileged; rather, they extend the general rule that a client's motive for hiring an attorney is privileged.

The cases and commentators uniformly agree that a client's identity is not privileged (even if incriminating) unless disclosure of that identity would necessarily disclose other privileged information. Indeed, this distinction was alive and well even in 1826, when Justice Story held that the fact of an attorney's employment is a preliminary fact and therefore not privileged; but when disclosure of that fact would reveal the client's motive or strategy, then the fact of employment becomes privileged. *See Chirac v. Reinicker*, 24 U.S. (11 Wheat.) 280, 294–95, 6 L.Ed. 474 (1826); *see also Goddard v. United States*, 131 F.2d 220, 221 (5th Cir.1942) (attorney-client privilege extends "only to the communications made in the attorney-client relationship, not to the fact that such a relationship existed"). More recently, the former Fifth Circuit held that the attorney-client privilege "cannot be invoked to prevent disclosure of the client's name or the fees actually paid;

[it] protects the disclosure of confidential information only." *Wirtz v. Fowler*, 372 F.2d 315, 332 (5th Cir.1966). The holding in *Wirtz* is completely consistent with *Baird* and *Jones* if the latter two cases are viewed merely as extending the general rule that a client's motive is confidential information.

Other circuits, including the Ninth Circuit, have expressly adopted this interpretation of *Baird* and *Jones*. In *Tornay v. United States*, 840 F.2d 1424, 1428 (9th Cir.1988), the Ninth Circuit stated, "[a] careful reading of *Baird*, and close examination of subsequent cases, indicates that *Baird* applies only when it is shown that, because of exceptional circumstances, disclosure of the client's identity or the existence of a fee arrangement would reveal information that is tantamount to a confidential professional communication." Thus, the court recognized the distinction between a disclosure of identity only and a disclosure of identity that reveals other, privileged information. Other circuits have also recognized this distinction. *See, e.g., In re Grand Jury Proceedings (85 Misc. 140)*, 791 F.2d 663, 665 (8th Cir.1986); *In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 247–48 (2d Cir.1985) (en banc); *United States v. Ricks*, 776 F.2d 455, 465 (4th Cir.1985), *vacated on other grounds*, 784 F.2d 544 (4th Cir.), *on reh'g en banc*, 802 F.2d 731 (4th Cir.) (reversing district court judgment on other grounds), *cert. denied*, 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986); *In re Shargel*, 742 F.2d 61, 63–64 (2d Cir.1984); *United States v. Liebman*, 742 F.2d 807, 810 (3d Cir. 1984); *In re Witnesses Before the Special March 1980 Grand Jury*, 729 F.2d 489, 494–95 (7th Cir.1984); *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 453 (6th Cir.1983), *cert. denied*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). *But see In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Jose Evaristo Reyes–Requena*, 724 F.Supp. 458, 462–64 (S.D.Tex.1989) (basing last link doctrine on incriminating effect of fee information). Furthermore, Wigmore, the most respected commentator on the attorney-client privilege, has recognized the distinction. He states:

The identity of the attorney's client ... will seldom be a matter communicated in confidence....

On the other hand, the litigant is not entitled to ask any more than serves to fix the *client's identity*. A communication as to the nature of the title claimed, or the capacity in which suit was brought, or the ultimate motive of the litigation, is equally protected with others, so far as any policy of the privilege is concerned.

8 J. Wigmore, *supra* § 2313, at 609 (emphasis in original).

To summarize, the last link doctrine, in this and other circuits, protects a client's identity when disclosure of that identity would disclose *other*, privileged communications (e.g., motive or strategy) and when the incriminating nature of the privileged communications has created in the client a reasonable expectation that the information would be kept confidential.

### C.

■ Today we examine the status of information relating to the amount of attorney's fees paid by a client whose identity is already known when evidence of that amount could incriminate the client. The district court held that "[w]here the Government's case against its suspect is complete except for a matter arising out of the confidential relationship, that matter must be privileged." 717 F.Supp. at 1510. Thus, the district court determined that the fee information fell within the last link doctrine and therefore was confidential simply because it might be incriminating. We think that this holding is plainly inconsistent with prior holdings of this court and with the holdings of all other circuit courts that have confronted this problem.

In *In re Grand Jury Subpoena of Slaughter*, 694 F.2d 1258 (11th Cir.1982), this court addressed a case in which the attorney's client was under investigation for tax evasion, racketeering, and drug-related crimes. The grand jury and the federal investigators already knew the client's identity and sought only information relating to the amount of fees paid by the client. *Id.* at 1259. The court held that, under *Jones,* courts could "not require disclosure where *more than simple fee information* will necessarily come to light ..., thereby uncovering privileged information." *Id.* at 1260 (emphasis added). The court then noted that the identities of the client and attorney were already known and held that "[t]he attorney-client privilege ... will not be violated by disclosure in this case." *Id.*

This court confronted an identical situation in *In re Grand Jury Investigation (Harvey),* 769 F.2d 1485 (11th Cir.1985), and reached the same conclusion, holding that *Jones* "is not applicable to the case *sub judice* because the identity of the client is known, as well as the existence of the fee. What is unknown is the amount of the fee[,] *and such information is properly discoverable by a Grand Jury."* *Id.* at 1487 (emphasis added); *see United States v. Sims,* 845 F.2d 1564, 1569 (11th Cir.) (*Jones* not applicable when identity of client already known), *cert. denied,* —— U.S. ——, 109 S.Ct. 395, 102 L.Ed.2d 384 (1988); *United States v. Innella,* 821 F.2d 1566, 1567 (11th Cir.1987) (last link doctrine applicable only to situations in which information sought would disclose unidentified client); *United States v. Denaro,* 647 F.Supp. 112, 113 (S.D.Fla.1986) (last link doctrine not applicable in cases where client's identity is known).

One could conceivably argue that *Slaughter* and *Harvey* are inapplicable to the case at hand because they addressed only whether or not the requested fee information fell within the undisclosed identity exception—not whether an exception should be created for information regarding the amount of fees paid. Such an argument, however, would not be persuasive. The undisclosed identity exception is not a doctrine unto itself: it merely defines a certain type of information protected by the attorney-client privilege. *See Jones,* 517 F.2d at 674–75. In reaching the *Jones* question and deciding that *Jones* does not apply, a court simply determines that the information at issue is not privileged. Thus, the *Slaughter* and *Harvey* courts were asked to do no less than we are asked to do in this case—to determine whether information regarding only the amount of fees paid is privileged. In both

of those cases, the information sought appeared to be very incriminating, but the courts' holdings were unambiguous: "such information is properly discoverable by a Grand Jury," *Harvey*, 769 F.2d at 1487; and "[t]he attorney-client privilege . . . will not be violated by disclosure in this case," *Slaughter*, 694 F.2d at 1260. To have so held, those courts must have found, on the facts before them, no exception to the general rule that the amount of fees paid is not privileged. Today we are faced with facts indistinguishable from those addressed by the *Slaughter* and *Harvey* courts. We therefore are not at liberty to find an exception and think that the district court erred in doing so.

Even if *Harvey* and *Slaughter* are not controlling in this case, we think that the district court's holding is indefensible. By basing the last link doctrine solely on the incriminating nature of information that is ordinarily not privileged, the district court distorts that doctrine and threatens to make the law in this circuit inconsistent with that in every other circuit that has addressed the issue. As we explain above, under the last link doctrine and the attorney-client privilege generally, a court must focus on whether disclosure of ordinarily nonprivileged information would necessarily reveal other, ordinarily privileged information that the client, under the circumstances, reasonably expected would be kept confidential. That the amount of fees might tend to incriminate the client simply does not matter, *see, e.g., Slaughter*, 694 F.2d at 1259–60; what does matter is whether disclosing the amount of fees would reveal other, confidential information, such as information regarding motive or strategy, that might form the last link in a chain of incriminating evidence, *see Tornay*, 840 F.2d at 1428; *Shargel*, 742 F.2d at 64; *Special March 1980 Grand Jury*, 729 F.2d at 494–95; *cf. Jones*, 517 F.2d at 674–75.

Properly understood, our task today is simply to instruct the district court how to evaluate whether disclosure of the seven requested items would reveal other privileged information. To aid the district court in evaluating this question, we consider two alternative situations: we first assume that disclosure will reveal nothing but the amount of fees paid; we then assume that the requested documents contain other information in addition to raw numbers.

1.

 Suppose that the requested documents reveal only the amount of attorneys' fees paid. We must then ask: what information do those numbers communicate? Such numbers merely record a physical act—the client's act of tendering money to the attorney (or perhaps the act of promising to tender money to the attorney). By paying, or promising to pay, money to the attorney, the client either discharges a debt owed for services rendered or retains the attorney's future services.[4] This is not to say, however, that such acts never communicate information. The client who pays, or promises to pay, money communicates a fact—that he has, or will obtain, possession of that amount of money. It is this communication with which the district court appears to be concerned.

Unquestionably, this communication can be incriminating when the government is investigating unexplained wealth in connection with drug transactions or tax evasion. However, every time a client pays, or promises to pay, fees, the client makes the statement, "I have, or will have, possession of a sufficient amount of money to pay your fee." Because courts have determined that records of fees paid are nonprivileged unless made privileged by *other*, confidential communications, the statement, "I have, or will have, X dollars" cannot be a confidential communication: the statement is simply part of the act of payment, which

---

**4.** The act of paying, or promising to pay, is roughly analogous to what J.L. Austin called a performative: a statement intended not to refer to historical fact but to accomplish or to do something. *See* J.L. Austin, How to Do Things with Words 4–7 (2d ed. 1975). For example,

Austin argued that a groom's statement "I do" is intended to accomplish something, and in the proper context with the necessary rules in place, that statement will create a legally recognized result—marriage. *Id.* at 5, 14–15.

courts have said is not confidential. *See, e.g., Slaughter,* 694 F.2d at 1260; *Wirtz,* 372 F.2d at 332.

Furthermore, requiring disclosure of the implied statement, "I have, or will have, X dollars" does not work against the policy underlying the attorney-client privilege. As we note above, the privilege is designed to encourage the free flow of information between the attorney and client, with the goal of enhancing the effectiveness of the attorney's representation. The Second Circuit has said that the privilege protects attorneys from the dilemma of either encouraging the client not to disclose incriminating information (and thereby running the risk of giving incompetent advice) or encouraging full disclosure at the risk of having to reveal incriminating information. *See Shargel,* 742 F.2d at 63. That danger does not exist in this situation since "[p]rofessionally competent and informed advice can be rendered by an attorney even though he or she must disclose that a fee was a gem suspected to have been recently stolen, currency with certain serial numbers, or *a sum far in excess of the client's reported income." Id.* (emphasis added); *see Special March 1980 Grand Jury,* 729 F.2d at 495 (view that disclosure of incriminating fee information is required unless disclosure reveals other, confidential information is "dictated by the purpose of the privilege—to encourage full and free disclosure by clients to their lawyers").

Courts have never recognized the implied statement "I have, or will have, X dollars" as being a confidential communication for the purposes of the attorney-client privilege. The client may subjectively expect the attorney to keep that information hidden, but, like the bald bank robber who expects his attorney to keep his baldness a secret, the client expects in vain. *See generally* 8 J. Wigmore, *supra* § 2306, at 590. We can conceive of no other statement implied by the payment of, or promise to pay, fees; therefore, we hold as a matter

of law that records of *only* such conduct do not fall under the last link doctrine and consequently are not privileged.

### 2.

Assuming that the requested documents contain other information, the court's task is still a simple one. The district court must determine whether that other information is normally protected by the attorney-client privilege and, if so, whether the client reasonably expected the attorney to keep that information secret. For example, a receipt or ledger entry might read, "X dollars, received in payment of fees owed for services rendered in connection with researching theory Y and interviewing witness Z." Or, the same documents might read, "X dollars, received in payment of retainer to secure services in paying unpaid taxes to IRS." Obviously, disclosure of those records would reveal other, normally privileged information, which the client might reasonably have expected the attorney to keep confidential.[5] In such a case, the last link doctrine would apply, and the district court should redact, if possible, the privileged information before requiring disclosure of the fee records.

### D.

We are therefore electing to follow the procedure adopted by the Seventh Circuit in *Special March 1980 Grand Jury,* 729 F.2d at 495. In that case, the court did not adopt a blanket rule that all records regarding the amount of fees paid are nonprivileged. Rather, the court noted that such records might contain other privileged information regarding the client's motive for hiring the attorney or the litigation strategy. *Id.* Thus, the case was remanded to the district court for it to determine, *in camera,* whether the requested records revealed such other privileged information. We think that such a procedure is appropriate in this case. Additionally, the district

---

5. In this case, the motive for retaining the services of the appellee—to defend Garcia against drug-trafficking, RICO, and civil rights charges—is well known and therefore not confidential, privileged information. *See* 8 J. Wigmore, *supra* § 2311, at 599. Thus, a record that reads something like, "X dollars, received in payment of fees for services rendered in defending Y against drug-trafficking charges" should not be protected.

court should redact, *in camera,* any privileged information from the fee records and, if redaction is possible, compel disclosure of those records.

### III.

Rabin and the three other subpoenaed witnesses argued in their joint motion to quash the subpoena that enforcement of the subpoena would infringe their clients' sixth amendment right to counsel. We need not address the merits of that argument on this appeal since Rabin has not presented a sixth amendment claim that is ripe for judicial determination and since he lacks standing to litigate his client's sixth amendment right to counsel. We address each problem in turn.

### A.

■ Article III of the United States Constitution allows the federal courts to hear only cases or controversies. To satisfy the case-or-controversy requirement, the purported dispute "must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). "[A]bstract, hypothetical or contingent questions" are not sufficient to invoke the judicial power of the United States. *Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945). Instead, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). These principles are based on the policy of "requir[ing] adequate factual information ... to avoid 'dialectics ... [and] sterile conclusions unrelated to actualities.'" Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1372 (1973) (quoting Frankfurter, A Note on Advisory Opinions, 37 Harv.L.Rev. 1002 (1924)).

*Halder v. Standard Oil Co.,* 642 F.2d 107 (5th Cir. Unit B Apr. 1981), is an excellent example of how we have applied these principles. In *Halder,* the plaintiff was engaged in a franchise relationship with Standard Oil when the State of Georgia announced plans to acquire by power of eminent domain the parcel of land on which the plaintiff's service station was located. The plaintiff, fearing that Standard Oil would terminate the franchise relationship and thereby deny the plaintiff just compensation from the State for the goodwill developed by him, sought various forms of injunctive relief designed to prevent the State from awarding just compensation to Standard Oil only. The court noted that the plaintiff's case required the conjunction of several contingencies: (1) the severing of the franchise relationship; (2) the taking of the parcel by the State; (3) the payment of compensation for goodwill; and (4) the denial of fair apportionment. *Id.* at 110–11. The court held that, in light of the many contingencies, the plaintiff's case was simply too hypothetical to adjudicate. *Id.* at 112.

We think that Rabin's sixth amendment arguments are similarly hypothetical and abstract. Rabin's sixth amendment argument was best stated by *Amicus Curiae* as follows:

> Considering the nature of the charges in this case and the government's use, and intention to continue to use, evidence of unexplained wealth on the part of [Garcia], this Defendant, and those similarly situated, are put in an untenable position once they are formally charged. If [Garcia] has funds to retain private counsel, he would have to commit perjury in order to be declared indigent and eligible for court appointed counsel. If he chooses to hire private counsel, he knows, with certainty, that his lawyer will ultimately be subpoenaed before a grand jury or to trial and be forced to reveal the amount of fees paid.

Joint *Amicus Curiae* Brief of National Association of Criminal Defense Lawyers and Florida Association of Criminal Defense Lawyers at 5–6.

It is clear, however, that the "untenable position" that Rabin and *Amicus* fear bears no relation to the current realities of this case. At this time, Garcia *has* court-appointed counsel, and the record contains no evidence that this counsel is inadequate, or that this attorney-client relationship necessarily will be severed once the information is disclosed. Furthermore, there is no evidence that if Garcia's attorney loses his court-appointed status he will not continue to represent Garcia *pro bono* or for a reduced fee. Finally, there is no evidence that if Garcia loses his court-appointed counsel he will not be able to retain the services of another attorney. Like the court in *Halder,* we must wait for the attorney-client relationship to end and for the other contingencies to occur before we may adjudicate the sixth amendment claim.

A brief examination of a case in which the Supreme Court found the dispute to be ripe demonstrates that this case is not ripe. In *New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), a witness gave immunized testimony before a state grand jury and was later prosecuted by the State of New Jersey. Prior to trial, the witness sought a ruling from the trial judge that no immunized grand jury testimony would be used against him on cross-examination. The judge ruled, however, that under New Jersey's rules of procedure, if the witness took the stand, immunized testimony could be used to impeach the witness. The witness elected not to take the stand and was convicted. On appeal, the witness argued that the New Jersey rule in that case infringed his fifth amendment privilege against self-incrimination, and the Court held that the claim was ripe for determination even though the witness never took the stand. *Id.* at 456, 103 S.Ct. at 1295. The Court reasoned that the dispute was a concrete case or controversy because the witness' injury was not contingent on any further event—the witness could allege that he had already been injured. *See id.* at 455–56, 103 S.Ct. at 1295.

Unlike the witness in *Portash,* Rabin cannot point to an existing injury. Nor can he point to an imminent injury that would inexorably result from disclosing the requested information. If, in fact, (1) the information is disclosed, (2) Garcia's attorney terminates the relationship because of the disclosure, (3) Garcia cannot retain the services of any other attorney due to fear of disclosure, (4) no attorney is willing to represent Garcia *pro bono* or for a reduced fee, and (5) Garcia cannot obtain court-appointed counsel, *then* Garcia's claim might be ripe and he could move to dismiss an indictment returned by a grand jury that has obtained the requested information. *See generally United States v. Melvin,* 650 F.2d 641, 643–44 (5th Cir. Unit B. July 1981) (discussing standard for dismissing an indictment for constitutional violation). But those facts are not before us now, and to assume their existence is to engage in adjudication by hypothesis. As our predecessor court aptly put it, "it is not the function of a United States District Court to sit in judgment on these nice and intriguing questions which today may readily be imagined, but may never in fact come to pass." *American Fidelity & Cas. Co. v. Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co.,* 280 F.2d 453, 461 (5th Cir.1960). We therefore hold that Rabin's sixth amendment claim is not ripe for adjudication.

### B.

■ Even if the sixth amendment claim were ripe, Rabin could not assert Garcia's right to counsel as a basis for quashing a subpoena directed at Rabin.[6] The Supreme Court has long held that, as a matter of article III standing and judicial self-restraint, "[o]rdinarily, one may not claim standing in [the federal courts] to vindicate the constitutional rights of some third party." *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953). Because the rule is most often phrased in terms of prudential concerns rather than constitutional mandate, the

---

**6.** Although Garcia moved to intervene in the proceedings regarding the motion to quash, the district court denied that motion. Therefore, Garcia is in no way involved in this case.

Court has recognized exceptions in several instances. The Court consistently considers three factors when determining whether a party may assert the constitutional rights of a third party: "first, the presence of some substantial relationship between the claimant and the third parties; second, the impossibility of the rightholders' asserting their own constitutional rights; and third, the need to avoid a dilution of third parties' constitutional rights that would result were the assertion of jus tertii not permitted." Note, Standing to Assert Constitutional Jus Tertii, 88 Harv.L.Rev. 423, 425 (1974) (footnotes omitted).

While there may be a substantial relationship between Garcia and his former attorney, Rabin, we think that Garcia himself may adequately assert his sixth amendment right. Furthermore, there is no danger of diluting Garcia's sixth amendment right to counsel before Garcia is able to assert it. Upon indictment, if Garcia's sixth amendment right is infringed by disclosure of the information, he may assert that right in a motion to dismiss the indictment. *See generally Melvin*, 650 F.2d at 643–44. Or, he may later move to suppress at trial the evidence produced by Rabin before the grand jury. *See generally Tornay v. United States*, 840 F.2d 1424, 1430 & n. 6 (9th Cir.1988). We simply cannot perceive how Rabin might represent the only means of adequately enforcing Garcia's sixth amendment right to counsel. *Cf. Eisenstadt v. Baird*, 405 U.S. 438, 445–46, 92 S.Ct. 1029, 1034–35, 31 L.Ed.2d 349 (1972) (litigant may assert third party's rights if litigation without such an asser-

tion might impair those rights). We hold, therefore, that this case does not fall within the exception to the general rule that parties may not assert the constitutional rights of others.

## IV.

■ Finally, we come to Rabin's argument that the subpoena represents an abuse of the grand jury process. Rabin argued before the district court that the subpoenas were issued simply to gather more evidence against the officers on the *pending* charges. Rabin, along with his co-movants, alleged that the Government's dominant purpose was to collect evidence for the retrial of the pending charges and that the IRS investigation was used merely as a "cloak" to cover the Government's "discovery dagger."[7]

Rabin is correct in his statement of the general rule: a prosecutor may not use the grand jury's subpoena power to gather evidence solely for use in the trial of a pending indictment. *See* 8 J. Moore, Moore's Federal Practice ¶ 6.04[5] (1989). We cannot agree, however, with his application of that rule to this case. This court hesitates before finding a prosecutor's "sole or principal purpose" in issuing a subpoena to be to gather evidence for a pending trial. *See generally Beverly v. United States*, 468 F.2d 732, 743 (5th Cir.1972). Indeed, "in the absence of clear evidence to the contrary," we will presume that a prosecutor has acted properly in issuing the subpoena. *Id.* (quoting *United States v. Chemical Found.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71

---

7. We note in passing that even if the Government's sole or dominant purpose was improper, we probably would not allow Rabin to assert that claim. Witnesses generally may not challenge a grand jury's jurisdiction or the scope of its investigation. *See Blair v. United States*, 250 U.S. 273, 281–82, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919); *United States ex rel. Rosado v. Flood*, 394 F.2d 139, 141 (2d Cir.), *cert. denied*, 393 U.S. 855, 89 S.Ct. 111, 21 L.Ed.2d 124 (1968). Rabin's challenge is, in essence, a challenge to the grand jury's scope of investigation, and we think that the target of the investigation, Garcia (who may move to dismiss the indictment or suppress the evidence at trial), is the only person who may assert such a claim. *See* 2 S. Beale & W. Bryson, Grand Jury Law and Practice § 10.15,

at 57 n. 19 (1986); *see also United States v. (Under Seal) (In re Antitrust Grand Jury Investigation)*, 714 F.2d 347, 351 (4th Cir.) (existence of alternative remedy important in determining whether to quash an indictment), *cert. dismissed*, 464 U.S. 978, 104 S.Ct. 1019, 78 L.Ed.2d 354 (1983).

Of course, a witness may move to quash a subpoena on the ground that the Government is attempting to harass or embarrass him. *See, e.g., Ealy v. Littlejohn*, 569 F.2d 219, 227 (5th Cir.1978) (Government may not use the grand jury to engage in fishing expedition). The record, however, does not contain any evidence that the Government used the subpoenas to harass or embarrass the attorneys.

L.Ed. 131 (1926)). As one court has stated, "[o]nce it is shown that a subpoena might aid the grand jury in its investigation, it is generally recognized that the subpoena should issue even though there is also a possibility that the prosecutor will use it for some purpose other than obtaining evidence for the grand jury." *United States v. (Under Seal) (In re Antitrust Grand Jury Investigation)*, 714 F.2d 347, 350 (4th Cir.), *cert. dismissed*, 464 U.S. 978, 104 S.Ct. 1019, 78 L.Ed.2d 354 (1983).

In this case, the clients of the subpoenaed attorneys had not previously been indicted for tax evasion or failure to file returns. The Government has alleged that one of its primary purposes in issuing the subpoenas was to gather information relevant to the grand jury's investigation of possible tax evasion by the remaining officers. The requested information, while clearly relevant to the pending indictments, was also clearly relevant to the stated purpose of the grand jury's ongoing investigation.[8] We cannot find clear evidence of prosecutorial misconduct and therefore presume that the Government acted properly and did not issue the subpoena for the sole or dominant purpose of collecting more evidence for the retrial of the charges pending against Garcia.

## V.

To summarize, we think that the requested information is protected by the attorney-client privilege only if the district court finds, on remand, that ordinarily privileged information will be disclosed along with the fee information and that the privileged information cannot be redacted from the requested information. The district court should make this determination *in camera*. Furthermore, we hold that Rabin's sixth amendment claim is not ripe for adjudication and that Rabin does not have standing to assert, in his motion to quash, Garcia's sixth amendment right to counsel. Finally, we find no clear evidence indicating that the Government abused the grand jury's subpoena power. We therefore reverse the

district court's order quashing the subpoena directed to Rabin and remand for further proceedings consistent with this opinion.

REVERSED and REMANDED with instructions.

TJOFLAT, Chief Judge, concurring:

The last link doctrine is now part of this circuit's law, and we are required to apply that doctrine as best we can. Because I think that the court today correctly applies the last link doctrine, I fully concur in the court's opinion and disposition of this case. The doctrine's justification, however, continues to elude me, and, if we were sitting en banc today, I would suggest that we do away with it altogether. I write to explain briefly my objections to the doctrine.

The fundamental problem with the last link doctrine is its inherent inconsistency with the crime/fraud exception to the attorney-client privilege. In *Baird v. Koerner*, 279 F.2d 623, 632 (9th Cir.1960), the Ninth Circuit held that a client's identity should not be privileged when the attorney is employed "with respect to *future* criminal or fraudulent transactions." (Emphasis in original.) The court went on to hold that the attorney's employment in that case had "no reference to *future* criminal or fraudulent transactions involving the clients." *Id.* at 634 (emphasis in original). At the time *Baird* was decided, the first holding was correct, and the second holding, although questionable, might have been justifiable.[1] The strengthening of the crime/fraud exception over the three decades since *Baird*, however, has made the court's holdings regarding that exception wholly indefensible today. The following discussion demonstrates why *Baird* and the district court's opinion below cannot be squared with the modern conception of the crime/fraud exception. By examining both *Baird* and the present case in detail, I hope to demonstrate that the last link doctrine serves no legitimate purpose.

---

**8.** *See supra* note 7.

**1.** *See infra* note 2.

## A.

The attorney-client privilege is founded upon our society's interest in promoting the administration of justice through the provision of competent legal advice. In light of this goal, courts have created an exception to the privilege when the attorney-client relationship has been used to pervert the administration of justice. As Justice Cardozo said, "[t]he privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law." *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933).

Although Justice Cardozo framed the exception in broad terms, courts, until recently, limited the exception to rather narrow situations. Thus, when *Baird* was decided, most courts applied the exception only when the advice at issue was obtained in furtherance of *future* criminal or fraudulent conduct. *See, e.g., Sawyer v. Barczak (In re Sawyer's Petition)*, 229 F.2d 805, 808–09 (7th Cir.), *cert. denied*, 351 U.S. 966, 76 S.Ct. 1025, 100 L.Ed. 1486 (1956); *United States v. Bob*, 106 F.2d 37, 40 (2d Cir.), *cert. denied*, 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493 (1939); *see also* 2 E. Conrad, Modern Trial Evidence § 1083, at 259 (1956); 8 J. Wigmore, Evidence § 2298, at 573 (McNaughton rev. ed 1961). I am not aware of any cases decided prior to *Baird* that applied the crime/fraud exception to communications related to concealing evidence of past criminal or fraudulent conduct. Therefore, the *Baird* court justifiably held that the crime/fraud exception did not apply in that case because the attorney's services were not used to further future criminal or fraudulent activity—the false returns had already been filed.[2]

The breadth of the crime/fraud exception, however, has increased considerably since *Baird*. The exception now extends not only to communications made in furtherance of present or continuing illegal activity, *see In re Grand Jury Proceedings of Fine*, 641 F.2d 199, 203 (5th Cir. Unit A Mar. 1981); Developments in the Law—Privileged Communications, 98 Harv.L.Rev. 1450, 1509–10 (1985) [hereinafter Privileged Communications], but also to communications that use the relationship to conceal evidence of prior illegal activity, *see, e.g., In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1227 (11th Cir.1987); *In re Sealed Case*, 754 F.2d 395, 399–403 (D.C.Cir.1985); *Sound Video Unlimited, Inc. v. Video Shack Inc.*, 661 F.Supp. 1482, 1486 (N.D.Ill.1987); Privileged Communications, *supra*, at 1511–12. To invoke the exception in this circuit,[3] a party must show only two things. First, the party must make "a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice." *Schroeder*, 842 F.2d at 1226. Second, the party must make a showing "that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it." *Id.* The party seeking to invoke the exception, however, need not show that the attorney knew, or had reason to know, that his services were being used by the client to further a crime or fraud. *See Clark*, 289 U.S. at 15, 53 S.Ct. at 469–70; *United*

---

**2.** I use the term "justifiably" with caution. Prior to *Baird*, the Supreme Court held that "[t]he language of [I.R.C.] § 145(b) [ (1939) ] which outlaws willful attempts to evade taxes 'in any manner' is clearly broad enough to include false statements made to Treasury representatives for the purpose of concealing unreported income." *United States v. Beacon Brass Co.*, 344 U.S. 43, 45–46, 73 S.Ct. 77, 79, 97 L.Ed. 61 (1952). A reasonable interpretation of this holding could lead to the conclusion that the clients in *Baird* retained the attorney's services to help them conceal unreported income from the govern-

ment by not disclosing whose returns were deficient. If this characterization of *Baird* is correct, then, under *Beacon Brass*, the attorney's services were used to further criminal or fraudulent conduct, and that conduct could be deemed to be future conduct.

**3.** Most circuits have adopted a test similar to the one articulated by this court in *Schroeder*, 842 F.2d at 1226. See, for example, the cases cited in *Schroeder*, 842 F.2d at 1226–27.

*States v. Ballard,* 779 F.2d 287, 292 (5th Cir.), *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *see, e.g., Schroeder,* 842 F.2d at 1227.

### B.

If *Baird* were being decided today, the court should hold, based on the crime/fraud exception, that information regarding the clients' identities is not privileged. Section 7201 of the Internal Revenue Code makes willfully attempting to evade or defeat, in any manner, any taxes imposed by the Code a felony. The Supreme Court, in *United States v. Beacon Brass Co.,* 344 U.S. 43, 45–46, 73 S.Ct. 77, 79, 97 L.Ed. 61 (1952), held that conduct occurring after the filing of the false return would constitute an attempt to evade taxes if the conduct was designed to conceal the unreported income. *See* H. Balter & J. Guidotti, Tax Fraud and Evasion ¶ 12.02[1][b] (5th ed. 1983). The IRS special agent in *Baird* presented strong evidence that the attorney's clients believed they underpaid their taxes and were attempting to conceal their identities. Furthermore, the letter from the attorney to the IRS clearly indicated that his services had been used to help the clients conceal their identities. Thus, the evidence in *Baird* suggested that the attorney's services were related not only to concealing evidence of a past crime but also, under *Beacon Brass,* to the ongoing crime of tax evasion. The evidence was more than sufficient to make a prima facie showing that the crime/fraud exception applied to the clients' communication of their identities *and* their motives to the attorney. Consequently, the modern view of the crime/fraud exception would require disclosure of the clients' identities in *Baird* even though such disclosure would reveal their motives for retaining the attorney's services.

### C.

Applying the crime/fraud exception to the case at hand again shows the inherent inconsistency between that exception and the last link doctrine. Because bank records are not privileged, the only situation in which the government would seek the attorney's records relating to the amount of fees paid is when the client has paid some or all of the fees in cash. Conducting business transactions in cash in order to avoid bookkeeping and bank records is a very common means of hiding income and evading taxes. *See* H. Balter & J. Guidotti, *supra* ¶ 2.01[2], at 2–4. In fact, several courts have held that evidence of substantial cash transactions can support a finding that the taxpayer willfully attempted to avoid paying taxes. *See, e.g., United States v. Hughes,* 766 F.2d 875, 878 (5th Cir.1985); *United States v. White,* 417 F.2d 89, 92 (2d Cir.1969), *cert. denied,* 397 U.S. 1030, 90 S.Ct. 1256, 25 L.Ed.2d 543 (1970). Indeed, any time the alleged misconduct has as its motive pecuniary gain, it is reasonable to assume that conducting business transactions in cash would be a common method of hiding evidence of a sudden acquisition of wealth from the alleged misconduct. *Cf. United States v. Morris,* 647 F.2d 568, 572 (5th Cir. Unit B June 1981) (when there is other evidence of guilt, and crime is one normally committed for pecuniary gain, evidence of sudden acquisition of wealth admissible); *United States v. Tramunti,* 513 F.2d 1087, 1105 (2d Cir.) (same), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

Therefore, when the client has been charged with misconduct involving pecuniary gain [4] and the client obviously has paid his attorney's fees in cash, the two-prong showing required to invoke the crime/fraud exception should be satisfied. *See, e.g., Schroeder,* 842 F.2d at 1226–27. Assuming that the government can make a prima facie showing that the client has

---

4. When the misconduct alleged does not involve some type of pecuniary gain, I can conceive of no situation in which evidence of amount of fees paid would be relevant, although I do not exclude the possibility that the evidence might be germane to a collateral issue in a case not involving pecuniary gain. Evaluating the entire universe of cases in which the amount of fees might be relevant, however, is not necessary to show the basic inconsistency between the last link doctrine as applied to amount of attorney's fees and the crime/fraud exception.

engaged in the misconduct, then the second showing logically follows: by paying fees in cash rather than by some means that would leave a public record of payment, the client might have been hiding his ill-gotten gain. In other words, the communicative act of paying fees would have been in furtherance of a crime or fraud. Thus, by showing that the client paid fees but that no record of those fees exists (implying payment in cash), the government provides enough evidence to show that "the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it." *Id.* at 1226. Consequently, the attorney's records of the amount of fees paid should not be privileged: either the client has paid by some method that leaves a public record (e.g., by check), thus making the attorney's records nonconfidential, or the client has paid in cash, thus invoking the crime/fraud exception.

This conclusion is not a new one. Decisions binding on this panel have reached the same result. In *Pollock v. United States*, 202 F.2d 281 (5th Cir.), *cert. denied*, 345 U.S. 993, 73 S.Ct. 1133, 97 L.Ed. 1401 (1953), the government prosecuted the client for tax evasion using the net worth and gross expenditure methods.[5] Evidence was admitted at trial showing that the taxpayer had given substantial amounts of cash to his attorney who then applied the cash to the purchase price of real estate acquired for the taxpayer. *Id.* at 285. The court held that that information was not privileged, in part because the attorney was not acting in his professional capacity. *Id.* at 286. It then stated, however, that "[m]ore important, where the party is being tried for a crime in furtherance of which the communication to the attorney was made and evidence has been introduced giving color to the charge, it is well settled that the communication is no longer privileged." *Id.* Although *Pollock* does not deal with fees paid in cash, the principle is the same: the attorney-client privilege takes flight when the client, charged with conduct resulting in pecuniary gain, hands over substantial amounts of cash to his attorney. Whether the cash is used to pay the attorney's fees or to buy property, the relationship has been abused.

This court reached the same conclusion in *Schroeder*. In that case, the evidence suggested that the attorney was used not only to help the client establish certain companies but also to help the client dispose of unreported income. 842 F.2d at 1227 & n. 5. The *Schroeder* court held that "the requirement that legal advice must be related to the client's criminal or fraudulent conduct should not be interpreted restrictively." It then held that "any legal assistance [the client] received in disposing of income he did not report is related to his tax evasion," regardless of whether the attorney knew he was helping the client to evade taxes. *Id.*

I submit that these considerations and precedents should control our decision in this case. The Government certainly has submitted more than enough evidence to satisfy the first prong of the crime/fraud test. *See id.* at 1226. Furthermore, the foregoing discussion has shown that, because Garcia obviously paid his attorney's fees in cash, the second prong of the test also has been met. Even if Rabin did not know he was helping Garcia to hide relevant evidence of the alleged misconduct, he was in fact assisting Garcia in disposing of, or concealing, possibly unreported income or

---

5. In a net worth case, the government independently ascertains the taxpayer's beginning net worth (assets minus liabilities), adds the taxpayer's reported income over the period in question, and checks the sum against his ending net worth. *See* H. Balter & J. Guidotti, *supra* ¶ 10.04[10][b]. Unless rebutted by the taxpayer, proof that the taxpayer's net worth increased, that the increase was the result of taxable income, and that the taxpayer willfully failed to report the income is sufficient to make out a case of tax evasion. *See Holland v. United States*, 348 U.S. 121, 137–39, 75 S.Ct. 127, 136–37, 99 L.Ed. 150 (1954). Closely related to the net worth method, the gross expenditure method ignores the taxpayer's net worth and focuses on cash flow during the period in question. Following this method, a court asks whether the reported income was sufficient to meet proven expenditures during the period under investigation. *See* H. Balter & J. Guidotti, *supra* ¶ 10.04[10][d].

unexplained wealth. Simply by paying for services in cash, Garcia might have concealed relevant evidence, and such a method of conducting a business transaction, standing alone, would further the alleged misconduct. In this case, therefore, the crime/fraud exception should apply to the communicative act of paying fees.

### D.

Although I have examined in detail only two cases, an examination of all of the last link doctrine cases of which I am aware would demonstrate that the court applying the doctrine (whether properly or improperly) failed adequately to consider the crime/fraud exception. As one commentator has noted,

> One who reviews the [last link doctrine] cases will ... be struck by the prevailing flavor of chicanery and sharp practice pervading most of the attempts to suppress proof of professional employment, and general application of a rule of disclosure seems the approach most consonant with the preservation of the repute of the lawyer's high calling.

McCormick on Evidence § 90, at 216–17 (3d law. ed. 1984).

Cases may arise in which the client's identity or the amount of fees paid is justifiably privileged. For example, a client may reasonably expect his identity to be kept confidential when his motive for consulting with an attorney is to disclose the wrongdoing of others. *See In re Kaplan,* 8 N.Y.2d 214, 203 N.Y.S.2d 836, 839, 168 N.E.2d 660, 661 (1960) ("Since the client's communication to [his attorney] was made in the aid of a public purpose to expose wrongdoing and not ... to conceal wrongdoing, the seal of secrecy should cover the client's name...."). Those situations can be handled just as well, however, with a straightforward analysis of the attorney-client privilege unencumbered by the last link doctrine.

In sum, the last link doctrine serves no legitimate purpose. While couched in terms of fairness to the client and promotion of the administration of justice, it simply allows clients to further their misconduct by hiding relevant evidence. Clients with reasonable and just concerns about disclosure of their identities, the amount of their attorneys' fees, or other normally nonprivileged information undoubtedly will find protection in the law without the aid of the last link doctrine. Therefore, I think it is time for the en banc court to take a careful and critical look at this ill-conceived doctrine.

Before TJOFLAT, Chief Judge, FAY, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON and COX, Circuit Judges.

BY THE COURT:

A majority of the judges in active service, on the court's own motion, having determined to have this case reheard en banc,

IT IS ORDERED that the above cause shall be reheard by this court en banc *with* oral argument during the week of October 8, 1990, on a date hereafter to be fixed. The clerk will specify a briefing schedule for the filing of en banc briefs. The previous panel's opinion is hereby VACATED.